523 F.2d 611
 Ann DOE et al., Appellants in No. 74-1727,
v.
Frank S. BEAL, Individually and as Secretary of the
Department of Public Welfare, Commonwealth of
Pennsylvania, et al., Appellants in No. 74-1726.
 Nos. 74-1726 and 74-1727.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 24, 1974.
Reargued en banc May 8, 1975.
Decided July 21, 1975.
 
 Norman J. Watkins, Robert F. Nagel, Deputy Attys. Gen., Israel Packel, Atty. Gen., Harrisburg, for appellants in No. 74-1726.
 R. Stanton Wettick, Jr. and Judd F. Crosby, Jr., Pittsburgh, Pa., for appellants in No. 74-1727.
 Nancy M. Weinman, Philadelphia, Pa., for MacCoy, Evans & Lewis; Sylvia A. Law, New York City, Harriet Katz, Philadelphia, Pa., for Contributors to Pennsylvania Hospital, amicus curiae, on the brief.Argued October 24, 1974.
 Before KALODNER, VAN DUSEN and GIBBONS, Circuit Judges.
 Reargued en banc May 8, 1975.
 Before SEITZ, Chief Judge, and KALODNER, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 Before us are appeals both by plaintiffs and by the defendants from an order of a three-judge district court entered May 28, 1974, pursuant to an opinion which was filed by the district court on May 3, 1974. Doe v. Wohlgemuth, 376 F.Supp. 173 (W.D.Pa.1974).[1] The case was argued before a panel of this court on October 24, 1974. The panel's opinion and judgment were filed on December 10, 1974. On December 24, 1974, the plaintiffs (appellees and cross-appellants) petitioned the court to rehear the case en banc. On January 31, 1975, we vacated the panel's December 10, 1974, judgment and ordered the case to be reheard en banc. The case was reargued en banc on May 8, 1975.
 
 I. BACKGROUND
 
 2
 The facts appear in the district court's opinion. Doe v. Wohlgemuth, supra at 175-78. Briefly stated, the plaintiffs are women who are eligible for benefits under the Pennsylvania Medical Assistance Program (PMAP).[2] The defendants are "the Pennsylvania Department of Public Welfare (Department) and certain of its Officers and/or Administrative Representatives." Id. at 175. The plaintiffs challenge certain procedural requirements (hereinafter referred to as "procedures" or "regulations") which the Department has adopted to restrict PMAP payments for abortions.[3] The district court found that, under those procedures, abortions would only be performed under PMAP in the following situations:
 
 
 3
 " '1. There is documented medical evidence that continuance of the pregnancy may threaten the health or life of the mother;
 
 
 4
 2. There is documented medical evidence that the infant may be born with incapacitating physical deformity or mental deficiency; or
 
 
 5
 3. There is documented medical evidence that a continuance of a pregnancy resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of a patient;
 
 
 6
 4. Two other physicians chosen because of their recognized professional competency have examined the patient and have concurred in writing; and
 
 
 7
 5. The procedure is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals.' "
 
 
 8
 Id. at 175. See also Id. at 175 n. 1.[4] In effect, these requirements define a compensable "therapeutic" abortion, and exclude payment for non-therapeutic, or "elective," abortions. The district court found that PMAP also covers the costs of prenatal care, childbirth, and post-partum treatment when the woman chooses to bear the child. Id. at 187.
 
 
 9
 The plaintiffs attack the Department's regulations both on the statutory ground that they are inconsistent with Title XIX (commonly called " Medicaid") of the Social Security Act (hereinafter sometimes referred to as " the Act"), 42 U.S.C.A. § 1396 Et seq. (1974),[5] and also on the constitutional ground that they are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. In Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), the Supreme Court reversed the dismissal of a suit which challenged certain New York regulations under the Aid to Families with Dependent Children (AFDC) provisions of the Social Security Act, 42 U.S.C.A. § 601 Et seq. (1974). Like Medicaid, AFDC is a voluntary participation program. See Hagans v. Lavine, supra at 530 n. 1, 94 S.Ct. 1372. Like the plaintiffs in the case now before us, the plaintiffs in Hagans v. Lavine Challenged the New York regulations both on the ground that they were inconsistent with the Act and also on the ground that they violated the Equal Protection Clause of the Constitution. Id. at 530-31, 94 S.Ct. 1372. The Court held that the constitutional claim was sufficient to confer jurisdiction on the district court under 28 U.S.C. § 1343(3),[6] but required the district court on remand to consider the statutory claim first as a matter of pendant jurisdiction. Hagans v. Lavine, supra, at 536, 539-43, 94 S.Ct. 1372. The Supreme Court has recently made it clear that in the Title XIX setting it also desires the statutory claim to be carefully considered before constitutional questions are reached. In Westby v. Doe, --- U.S. ---, 95 S.Ct. 1385, 43 L.Ed.2d 648 (1975), vacating Doe v. Westby, 383 F.Supp. 1143 (D.S.D.1974), a policy of the Social Services Department of the State of South Dakota, which limited payment under Title XIX for abortions, was under review. The district court had reached the question of the policy's constitutionality without any consideration of the policy's consistency with Title XIX, and the Supreme Court summarily vacated and remanded for reconsideration in the light of Hagans v. Lavine.[7]
 
 
 10
 In the case before us, the district court considered the statutory claim, but decided that the Pennsylvania procedures were consistent with the Social Security Act. See Doe v. Wohlgemuth, supra at 182-86. Turning to the allegations of unconstitutionality, the court declared the procedures to be in violation of the Equal Protection Clause. See Id. at 186-92.[8]
 
 
 11
 Both arguments are renewed in this appeal. Because we believe that the principle of Hagans v. Lavine applies to the courts of appeals as well as to the district courts, we will consider first whether the Pennsylvania procedures are consistent with the Social Security Act. See Alma Motor Co. v. Timkin-Detroit Axle Co., 329 U.S. 129, 136-37, 67 S.Ct. 231, 91 L.Ed. 128 (1947);
 
 
 12
 United States v. Schiavo, 504 F.2d 1, 6-7 & n. 11 (3d Cir.
 
 
 13
 1974). II. SUPREME COURT PRECEDENT ON THE SCOPE OF
 
 
 14
 STATE PREROGATIVE UNDER THE SOCIAL SECURITY ACT
 
 
 15
 The district court reasoned that the Social Security Act was designed to give the states great latitude in establishing eligibility for, and levels of, benefits. Doe v. Wohlgemuth, supra at 184-86. The court relied principally on Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), in which the Supreme Court held that the Social Security Act allowed the states to place a ceiling on the amount of benefits available to recipients of AFDC. See also New York Dept. of Social Services v. Dublino, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) (a work incentive program added to the AFDC provisions of the Act does not pre-empt state work incentive programs); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (Texas' method of computation of AFDC benefits held consistent with the Act).
 
 
 16
 The Supreme Court has recognized an important qualification to the Dandridge v. Williams principle. In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 118 (1968), the Court held invalid Alabama regulations which prevented AFDC benefits from flowing to the children of women cohabiting out of wedlock. The Court found the regulations to be inconsistent with congressional policy regarding AFDC recipients. Similarly, in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Court held invalid a New York law which lowered the "standard of need" for AFDC benefits, finding the law to be inconsistent with what the Court "fathom(ed) to be the Congressional purpose" in enacting § 402(a)(23) of the Social Security Act, 42 U.S.C.A. § 602(a)(23) (1974). 397 U.S. at 414-15, 90 S.Ct. 1207. King And Rosado demonstrate that, although the AFDC program is a "scheme of cooperative federalism," King, supra, 392 U.S. at 316, 88 S.Ct. at 2128 it is not a scheme of unlimited state discretion. Instead, Congress defined an area of state prerogative, the boundaries of which are defined by the congressional policies both explicit and implicit[9] found in the Social Security Act. The King v. Smith principle was reaffirmed by an eight-Justice majority in Van Lare v. Hurley, --- U.S. ---, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975) (finding New York's "lodger" regulations inconsistent with the Social Security Act). See also Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970).
 
 
 17
 III. TITLE XIX AS A "SCHEME OF COOPERATIVE FEDERALISM"
 
 A. Areas of state discretion
 
 18
 Both parties agree with the district court that Title XIX, like AFDC, is a system of "cooperative federalism." Doe v. Wohlgemuth, supra at 184. The congressional desire to give the states considerable latitude in the administration of Title XIX is apparent throughout the statute. Funds are appropriated "(f)or the purpose of enabling each State, As far as practicable under the conditions in such State," to furnish medical assistance and other services. 42 U.S.C.A. § 1396 (1974) (emphasis added). The states are free to choose whether they will participate at all; a participating state's program can cover only the "categorically needy," § 1396(a)(10); 45 C.F.R. 249.10(a) (1) (Rev.Ed., Oct. 1, 1973); or it can be extended to include the "medically needy" as well. Section 1396(a)(10)(C); 45 C.F.R. § 249.10(a)(1).[10] If a state extends coverage to the medically needy, it can either give the types of care and services listed in clauses (1) through (5) of § 1396d(a) or give any seven of the types of care and services described in clauses (1) through (16) of § 1396d(a).[11] Section 1396a(a)(13)(C). The statute literally abounds with other options which are open to the participating states, all of which should help to tailor the state's program to the needs and conditions in that state, as contemplated in the appropriations section quoted above.
 
 
 19
 B. Explicit statutory limitations on state discretion
 
 
 20
 The story does not end with the litany of state discretion in A above. Many other provisions of the statute are designed to channel the state's program in directions which are consistent with the basic congressional objective of furnishing "medical assistance on behalf of families . . . whose income and resources are insufficient to meet the costs of necessary medical services." § 1396.
 
 1. Required services
 
 21
 Although the states were given a choice of services to provide to the medically needy, Congress requires the participating states to provide services (1) through (5) in § 1396d(a) to the categorically needy. § 1396a(a)(13)(B). Those services are the following:
 
 
 22
 "(1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing facility services, screening and diagnosis of children, family planning services and supplies furnished to individuals of child bearing age; and (5) physicians' services furnished by a physician whether in the office, patient's home, hospital or elsewhere."
 
 
 23
 Doe v. Wohlgemuth, supra at 183.
 
 2. Equality requirements
 
 24
 Another section of the Act requires the assistance made available to the categorically needy to be equitably distributed, and to be equal to the assistance made available to the medically needy:
 
 
 25
 "(a) A State plan for medical assistance must
 
 
 26
 (10) provide
 
 
 27
 (A) for making medical assistance available to all individuals receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV of this chapter, or with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter;
 
 
 28
 (B) that the medical assistance made available to any individual described in clause (A)
 
 
 29
 (i) Shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
 
 
 30
 (ii) Shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in clause A; and
 
 
 31
 (C) if medical assistance is included for any group of individuals who are not described in clause (A) and who do not meet the income and resources requirements of the appropriate State plan, or the supplemental security income program under subchapter XVI of this chapter, as the case may be, as determined in accordance with standards prescribed by the Secretary
 
 
 32
 (i) for making medical assistance available to all individuals who would, except for income and resources, be eligible for aid or assistance under any such State plan or to have paid with respect to them supplemental security income benefits under subchapter XVI of this chapter, and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical and remedial care and services, and
 
 
 33
 (ii) that the medical assistance made available to all individuals not described in clause (A) Shall be equal in amount, duration, and scope; . . . ."
 
 
 34
 Section 1396a(a)(10) (emphasis added).
 
 C. General limitations on state discretion
 1. Economy
 
 35
 In addition to the above express limitations on state prerogatives, the Act and its history include more general statements of purpose. These also are binding upon the participating states. Section 1396a(a)(17)(A) requires state-adopted standards for the receipt of benefits to be "consistent with the objectives of this subchapter (Title XIX)." See also King v. Smith and Rosado v. Wyman, supra.
 
 
 36
 Section 1396a(a)(30) requires the states to take such steps "as may be necessary to safeguard against unnecessary utilization of . . . care and services." This same emphasis upon payment for "necessary" medical services is reflected in § 1396, the appropriations section, which states that the purpose of the Act is "to furnish (1) medical assistance on behalf of families . . . whose income and resources are insufficient to meet the costs of necessary medical services." Similar language appears in the definition in § 1396a(a)(10)(C)(i) of the medically needy.[12] Limiting payments to those services which are "necessary" is also supported by recent amendments to Title XIX, which evidence a strong congressional interest in economy.[13]
 
 2. Physicians' discretion
 
 37
 It is also apparent that Congress intended to place the primary authority for determining what treatment a particular recipient requires in the hands of the attending physician. The Senate Committee on Finance, which in 1965 reported favorably on the amendments to the Social Security Act that included the creation of Title XIX, wrote:
 
 
 38
 "3. General Provisions Relating to the Basic and Voluntary Supplementary Plans
 
 
 39
 "(a) Conditions and limitations on payment for services
 
 
 40
 "(1) Physicians' role
 
 
 41
 "The committee's bill provides that the physician is to be the key figure in determining utilization of health services and provides that it is a physician who is to decide upon admission to a hospital, order tests, drugs and treatments, and determine the length of stay."
 
 
 42
 S.Rep.No.404, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Admin.News, pp. 1943, 1986. Although these remarks referred to the amendments to Medicare (Title XVIII), Congress understood Medicaid (Title XIX) as an expansion of the Medicare concept. The same Committee wrote:
 
 
 43
 "The committee bill is designed to liberalize the Federal law under which States operate their medical assistance programs so as to make medical services for the needy more generally available. To accomplish this objective, the committee bill would establish, effective January 1, 1966, a new title in the Social Security Act 'Title XIX: Grants to the States for Medical Assistance Programs.' "
 
 
 44
 Id. at p. 2014. Thus, in Roe v. Norton, 380 F.Supp. 726 (D.Conn.1974), the court discerned "the basic philosophy of both the Medicare and Medicaid provisions, which emphasizes the wide discretion to be accorded physicians in treating their patients." Id. at 729.[14]
 
 
 45
 We must conclude that although Title XIX involves a system of "cooperative federalism," the congressional hand has been rather heavy in circumscribing the area of state prerogative.
 
 
 46
 IV. THE PENNSYLVANIA REGULATIONS' CONSISTENCY WITH TITLE XIX
 
 
 47
 Pennsylvania argues that its abortion regulations pursue congressional objectives. The state relies on the congressional mandate, noted above, to provide only necessary services, arguing that its regulations restrict payments for abortions to those which are "necessary," excluding those which are "elective." The argument proves too much. It is undoubtedly true that at the time a woman chooses to have a non-therapeutic abortion there is a greater quantum of personal freedom than at the time she has a therapeutic abortion or goes into labor. But there is also greater freedom of choice involved when one decides to have a tooth cavity filled than when one is forced to have the tooth extracted after it has abscessed. The state could not require Title XIX beneficiaries to await the abscess and undergo the extraction[15] without damaging the broad purposes of Title XIX. And it is inconsistent with § 1396a(a)(10)(B) and (C), which requires equality among beneficiaries, to force pregnant women to use the least voluntary method of treatment, while not imposing a similar requirement on other persons who qualify for aid.
 
 
 48
 The plaintiffs, on the other hand, place their reliance on the sections of the statute which require Pennsylvania to furnish them physicians' services, inpatient hospital services, outpatient services, and family planning services.[16] Because Pennsylvania has chosen to extend coverage to the medically needy, and has chosen not to exercise its option under § 1396a(a)(13)(C)(ii) subsection (13)(C)(i) requires Pennsylvania to extend the services listed in the text to those plaintiffs who are on Public Assistance. For this reason, the plaintiffs are correct in arguing that the state is required to furnish all of them both those who are categorically needy and those who are medically needy the listed services.
 
 
 49
 In both the statute and the regulations of the Department of Health, Education and Welfare, physicians' services are defined by reference to the legal practice of medicine under state law. See § 1396d(a)(5), referring to § 1395x(r)(1); 45 C.F.R. § 249.10(b)(5) (Rev. ed., Oct. 1, 1973). Since Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), required the states to legalize the practice of elective abortion during the first two trimesters of pregnancy, the plaintiffs argue that elective abortion is now included in the definition of "physicians' services," and is therefore required to be furnished to the plaintiffs by § 1396a(a)(13)(B) and (C).[17] Similar arguments are advanced under the rubrics of "inpatient hospital services," "outpatient hospital services," and "family planning services."
 
 
 50
 Again, the argument proves too much. Elective cosmetic surgery, for example, is within the licensed practice of medicine in most, if not all, states. If the plaintiffs were correct, the state would be required to pay for such procedures, at the expense, perhaps, of many pressing medical needs of the poor.[18] While § 1903(e) of the original Act may have required the eventual funding of such procedures,[19] its repeal indicates that Congress has no present intention of funding every procedure which falls within the legal practice of medicine. The states are given broad discretion to tailor their programs to their particular needs, and are required to economize and to fund only necessary medical expenses.
 
 
 51
 The problem for this court is to harmonize the various competing policies found in the Act and its history. A participating state should be able to adapt its program to its conditions and needs, and to limit the level of its Medicaid expenditures. This can be accomplished by giving the state broad discretion to define the medical conditions for which treatment is "necessary" within the meaning of the Act.[20] The proper treatment of such a condition, on the other hand, must be left to the judgment of the attending physician.[21] See Roe v. Norton, supra at 729. Vesting such discretion in the physician is consistent with congressional objectives, see p. 618, Supra; it is also a logical prerequisite to any program intended to bring valid medical assistance to the needy.[22] See § 1396a(a)(19) (requiring states to safeguard "the best interests of the recipients").
 
 
 52
 Of course, some regulation of the methods of treatment is reasonable, and unavoidable. But the state should be required to show that, on balance, the policies of Title XIX support the regulations in question. See Doe v. Rose, 499 F.2d 1112, 1114 (10th Cir. 1974) ("the respective states are empowered to impose reasonable standards For carrying out the objectives of the federal program") (emphasis added). Under § 1396a(a)(19), for example, the state might require some procedures to be performed in hospitals, to protect the medical interests of the recipients. Or, pursuant to the congressional interest in economization, the state might require doctors to prescribe generic drugs rather than brand names, provided, of course, that this would, in the particular instance, be consistent with sound medical practice. Gratuitous interference with medical decisions by doctors, on the other hand, would create a system of medical obstruction, rather than of medical assistance.
 
 
 53
 Applying the above analysis to the Pennsylvania regulations before us, we find them to be inconsistent with the Act. Since the Commonwealth of Pennsylvania pays for full-term deliveries and also for therapeutic abortions, it is plain that the state has determined, in its discretion, that pregnancy is a condition for which medical treatment is "necessary" within the meaning of Title XIX. The next question is whether some justification can be found in the statute for preventing an attending physician from choosing non-therapeutic abortion as the method for treating a pregnancy.[23] We can find none. Economy will not do, since in most cases non-therapeutic abortion is the cheapest method of treatment. See Doe v. Rose, supra at 1116-17, Citing Klein v. Nassau Cty. Med. Ctr., supra note 12; Doe v. Wohlgemuth, supra at 187. Nor will protection of the recipient's health, under § 1396a(a)(19) suffice; the state itself admitted at oral argument that non-therapeutic abortion is the least dangerous alternative for the pregnant woman, at least during the first trimester. See Roe v. Wade, supra, 410 U.S. at 163, 93 S.Ct. 705. Not only are the state's abortion regulations not justified by any statutory policy, but they also run directly counter to § 1396a(a)(10)(B) and (C), since the "least voluntary method of treatment" requirement which the regulations impose on pregnant women is imposed on no other class of recipient. We therefore conclude that once the state has decided to finance full-term delivery and therapeutic abortion as methods for the treatment of pregnancy, it cannot decline to finance non-therapeutic abortions without violating the requirements of Title XIX. Since the decisions of the Supreme Court have forced the states to include elective abortion in the legal practice of medicine through the second trimester of pregnancy,[24] we also hold that the statute requires Pennsylvania to fund abortions through the end of the second trimester.[25]
 
 V. CONTRARY ARGUMENTS REJECTED
 
 54
 In reaching the above conclusion, we are not unmindful that other courts have found state provisions like Pennsylvania's to be consistent with the statutory scheme. In Roe v. Ferguson, 515 F.2d 279 (6th Cir. 1975), the Sixth Circuit reversed a district court's holding that Title XIX requires state funding for elective abortions. The court wrote:
 
 
 55
 "There is no indication that Congress intended to require the furnishing of abortion services not required for the preservation of the health of the woman at a time when the performance of such abortions was illegal in most jurisdictions. In view of the disfavor shown toward abortions in other legislation, we are reluctant to infer that Congress intended to include required coverage for such controversial services without even mentioning the subject. When Congress passed the Family Planning Services and Research Act of 1970, 42 U.S.C. §§ 300a et seq. providing funds to states opting to participate in creating comprehensive programs of family planning services, abortion was specifically excluded as a means of family planning to be recognized under the Act. 42 U.S.C. § 300a-6.
 
 
 56
 "In establishing the Legal Services Corporation system, Congress again provided that no funds of the Corporation could be used for legal assistance for those seeking to procure a nontherapeutic abortion. 42 U.S.C. § 2996f(b) (8)."
 
 
 57
 Id. See also Doe v. Rose, supra at 1114-15 ("prefer(ring)" to decide the case on constitutional grounds in light of the Act's silence on the abortion question); Doe v. Wohlgemuth, supra. We find none of these arguments to be persuasive. It is impossible to believe that in enacting Title XIX Congress intended to freeze the medical services available to recipients at those which were legal in 1965. Congress surely intended Medicaid to pay for drugs not legally marketable under the FDA's regulations in 1965 which are subsequently found to be marketable. We can see no reason why the same analysis should not apply to the Supreme Court's legalization of elective abortion in 1973. The inference which the Sixth Circuit drew from legislation in which Congress prohibited expenditure for non-therapeutic abortions also seems unwarranted. Congress could have proscribed payment for elective abortions when it passed the Family Planning Services and Research Act of 1970, or in 1972 when it amended Title XIX, but it did not do so. See Comment, Supra note 14, at 933 n.80. Furthermore, abortions are hardly a desirable method of family planning; this consideration may explain the provisions of the Family Planning Services and Research Act relied upon by the Sixth Circuit.
 
 
 58
 VI. CONCLUSION AND DISTRICT COURT ACTION ON REMAND
 
 
 59
 For the foregoing reasons, the plaintiffs are entitled to a declaratory judgment declaring that the Pennsylvania regulations are inconsistent with Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 Et seq., during the first and second trimesters of pregnancy.
 
 
 60
 In Hagans v. Lavine, Supra, 415 U.S. at 543-44, 94 S.Ct. 1372, the Supreme Court pointed out that a single district judge can grant both declaratory and injunctive relief on statutory grounds in a case such as this, using this language (415 U.S. 543, 94 S.Ct. 1382):
 
 
 61
 "Given a constitutional question over which the District Court had jurisdiction, it also had jurisdiction over the 'statutory' claim. See (Supra, at 536). The latter was to be decided first and the former not reached if the statutory claim was dispositive. (Citing cases.) The constitutional claim could be adjudicated only by a three-judge court, but the statutory claim was within the jurisdiction of a single district judge. (Citing cases.) Thus, the District Judge, sitting alone, moved directly to the statutory claim. His decision was appealed to the Court of Appeals, although had a three-judge court been convened, an injunction issued, and the statutory ground alone decided, the appeal would be only to this Court under 28 U.S.C. § 1253."
 
 
 62
 The court went on to state at 543-45, 94 S.Ct. at 1382:
 
 
 63
 "The procedure followed by the District Court initial determination of substantiality and then adjudication of the 'statutory' claim without convening a three-judge court . . . accurately reflects the recent evolution of three-judge-court jurisprudence . . . .
 
 
 64
 "It is true that the constitutional claim would warrant convening a three-judge court and that if a single judge rejects the statutory claim, a three-judge court must be called to consider the constitutional issue. Nevertheless, the coincidence of a constitutional and statutory claim should not automatically require a single-judge district court to defer to a three-judge panel, which, in view of what we have said in Rosado v. Wyman, Supra, could then merely pass the statutory claim back to the single judge. (Citing cases.) 'In fact, it would be grossly inefficient to send a three-judge court a claim which will only be sent immediately back. This inefficiency is especially apparent if the single judge's decision resolves the case, for there is then no need to convene the three judge court.' (Citing case.) Section 2281 does not forbid this practice, and we are not inclined to read that statute 'in isolation with mutilating literalness . . . .' "
 
 
 65
 We have quoted the foregoing because we hold at this time that the majority opinion in Murrow v. Clifford, 502 F.2d 1066 (3d Cir. 1974), will not be followed insofar as it is inconsistent with (a) part II of Hagans v. Lavine, supra,[26] and (b) this opinion.
 
 
 66
 Because of our power to modify the May 28, 1974, Supplemental Order of the district court under 28 U.S.C. § 2106, we will direct that it be modified to read as follows, and the case will be remanded to the district court so that the three-judge court can be dissolved, the assigned district judge to take any further action required consistent with this opinion:
 
 
 67
 " . . . IT IS HEREBY ADJUDGED AND DECREED that the Regulations and Procedures of the Department of Public Welfare of the Commonwealth of Pennsylvania, as they apply to reimbursement for abortions performed within the first two trimesters of pregnancy, are invalid because they are inconsistent with Title XIX of the Social Security Act, 42 U.S.C. § 1396 Et seq. In all other respects, Plaintiffs' Requests for Declaratory Judgment are denied."
 
 
 68
 Costs shall be taxed against defendant-appellants at No. 74-1726.
 
 
 69
 KALODNER, Circuit Judge (dissenting).
 
 
 70
 The majority holds that "the plaintiffs are entitled to a declaratory judgment declaring that The Pennsylvania regulations are inconsistent with Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 Et seq.; during the first and second trimesters of pregnancy," and further concludes that it is unnecessary to reach the plaintiffs' constitutional arguments. (emphasis supplied).
 
 
 71
 I dissent from the majority's holding that "the Pennsylvania regulations are inconsistent with * * * the Social Security Act." I disagree, too, with its conclusion that it is unnecessary to reach the plaintiffs' constitutional arguments.
 
 
 72
 I would affirm the holding of the three-judge court that the "Pennsylvania Regulations do not conflict with Title XIX of the Social Security Act."[1] (emphasis supplied).
 
 
 73
 I would also reverse the holding of the court below that "the Regulations and/or Procedures of the Pennsylvania Medical Assistance Program are unconstitutional because they are in violation of the Equal Protection Clause since they create an unlawful distinction between individual women who choose to carry their pregnancies to birth, and indigent women who choose to terminate their pregnancies by abortion."[2]
 
 
 74
 I would, however, enjoin enforcement of the Regulations on the ground that they are being administered in violation of the Equal Protection Clause of the Fourteenth Amendment in that they are Not enforced against welfare recipients who threaten suit when they are denied reimbursement for non-therapeutic abortions, and Enforced only against those who do not threaten suit. It is settled that State administrative procedures which are Per se valid and constitutional may nevertheless be enjoined when they are unconstitutionally applied.
 
 
 75
 The views expressed will be discussed Seriatim as follows:
 
 
 76
 I. THE PENNSYLVANIA REGULATIONS' CONSISTENCY WITH TITLE XIX.
 
 This must be said in preface:
 
 77
 First, two other Circuit Courts which have spoken to the question have expressly refused to subscribe to the view now espoused by the majority. Rose v. Ferguson, 515 F.2d 279 (6th Cir. 1975); Doe v. Rose, 499 F.2d 1112 (10th Cir. 1974).
 
 
 78
 Second, the majority's holding of inconsistency is nourished only by a single district court decision, Roe v. Norton, 380 F.Supp. 726 (D.Conn.1974).
 
 
 79
 Third, our brother Weis, a member of the three-judge court below, specifically expressed his concurrence with its holding that the Regulations are not inconsistent with Title XIX, albeit he dissented from its holding that the Regulations are unconstitutional.[3]
 
 
 80
 Fourth, the specific question "(w)hether the Social Security Act requires a federally-funded state medicaid program to pay for abortions that are not medically indicated," was answered in the negative by the Solicitor General of the United States in a "memorandum for the United States as Amicus Curiae."[4] (emphasis supplied).
 
 
 81
 Fifth, The Medical Assistance Services Administration in the Social and Rehabilitation Service of the Department of Health, Education, and Welfare, which administers the Medicaid aspect of the Social Security Act, has made it clear in a statement on its "position" on abortion, that a state participating in the Medicaid program has the Option of funding abortions, and, if it does, "the Federal Government shares the costs with the State."[5]
 
 
 82
 The points outlined will be more fully developed after the following discussion of the critical provisions of Title XIX and the Regulations.
 
 
 83
 Title XIX of the Social Security Act, popularly known as Medicaid, and the federal regulations promulgated thereunder, establish a comprehensive system of health care for the needy. In the spirit of "cooperative federalism," Congress annually appropriates funds to enable each state, "as far as practicable under the conditions in such State, to furnish . . . medical assistance" to designated families and individuals "whose income and resources are insufficient to meet the costs of Necessary medical services." 42 U.S.C. § 1396. (emphasis supplied).
 
 
 84
 A state is not required to participate in the Medicaid Program, but if it chooses to become a participant, it must submit a plan for medical assistance to the Department of Health, Education, and Welfare ("HEW") for approval, which is conditioned upon the plan comporting with the provisions of Title XIX. See 42 U.S.C. §§ 1396, 1396a(b). Thereafter, operation of the program is under state direction with continuing eligibility for federal grants subject to the state's compliance with the originally approved plan and federal regulations. See 42 U.S.C. § 1396c; 45 C.F.R. §§ 246-280.
 
 
 85
 As dictated by the federal statute and regulations, a state's Medicaid program Must provide medical assistance[6] to the "categorically needy," as spelled out by the majority. See 42 U.S.C. § 1396a(a)(10)(A).
 
 
 86
 A state may decide to limit coverage to the "categorically needy," or it may decide to include within the scope of its Medicaid program other groups or individuals in need of "necessary medical services."
 
 
 87
 A state whose medical assistance program extends beyond the "categorically needy," has the option of providing the five services made mandatory as to those in the "categorically needy" class, or selecting any seven of the services listed in clauses (1) through (16) of § 1396d(a). See 42 U.S.C. § 1396a(a)(13).
 
 
 88
 The five services made mandatory as to the "categorically needy" (included in Pennsylvania's Medicaid program) are:
 
 
 89
 "(1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases);
 
 
 90
 "(2) outpatient hospital services;
 
 
 91
 "(3) other laboratory and X-ray services;
 
 
 92
 "(4)(A) skilled nursing facility services (other than services in an institution for tuberculosis or mental diseases) for individuals 21 years of age or older (B) effective July 1, 1969, such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary; and (C) family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies;
 
 
 93
 "(5) physicians' services furnished by a physician . . . whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere," § 1396d(a).
 
 
 94
 A state is required to include in its Medicaid plan "reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of (Title XIX) . . . ." 42 U.S.C. § 1396a(a)(17). A state may properly limit the coverage of its Medicaid program to the costs of "necessary medical services." A state plan for medical assistance must provide that a method of "utilization review" be established for each item of care or services listed in 42 U.S.C. § 1396d(a) so as "to safeguard against unnecessary utilization of such care and services . . . ." 42 U.S.C. § 1396a(a)(30); 45 C.F.R. § 250.20(a). The federal regulations specifically authorize "(a)ppropriate limits . . . placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures." 45 C.F.R. § 249.10(a)(5)(i).
 
 
 95
 Furthermore, any medical services made available to a "categorically needy" person must not be less in "amount, duration, or scope" than that provided other groups or individuals. Services made available to a group other than the "categorically needy" must be equal in "amount, duration, and scope" for all individuals within the group, 42 U.S.C. § 1396a(a)(10), but may be less than or differ from those benefits provided the "categorically needy."[7]
 
 
 96
 In summary outline, Title XIX provides for a federal-state funded program which permits each state to decide whether it will participate and what services it will provide, and to whom, subject to the requirement that certain welfare recipients must be included and certain items of basic medical care must be furnished.[8]
 
 
 97
 The Pennsylvania Medical Assistance Program ("PMAP") was designed to comport with the requirements of Title XIX. It provides, inter alia, for reimbursement for medical services to the "categorically needy," and the "medically needy," affording to the latter the five services made mandatory as to the "categorically needy,"[9] earlier here spelled out.
 
 
 98
 Regulations pertaining to the administration of PMAP provide for reimbursement of costs of an abortion only where "there is documented medical evidence," submitted by the attending physician and two other physicians, that "continuance of the pregnancy may threaten the health or life of the mother," or, that "the infant may be born with incapacitating physical deformity or mental deficiency," or, that "a continuance of pregnancy resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of a patient," and "the procedure is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals."
 
 
 99
 The recited provisions of the Regulations, as the majority has well said, "in effect . . . define a compensable 'therapeutic' abortion, and exclude payment for non-therapeutic, or 'elective' abortions."
 
 
 100
 The plaintiff-welfare recipients contended below that the cited Regulations contravene Title XIX, because, in their view, An abortion, whether it be therapeutic or non-therapeutic, Is a "necessary medical service" within the meaning of the Title and the purview of its categories of "physicians' services"; "inpatient and outpatient hospital services", and "family services."
 
 
 101
 In disposing of these contentions, the court below said:
 
 
 102
 "Congress was silent with respect to specific authorization of medical assistance for abortions. Pennsylvania standards must be scrutinized without curtailment by Congressional action and the State Regulations and/or Procedures must be given great latitude in providing for the administration of the Program. We, therefore, feel compelled to find Pennsylvania's Regulations do not conflict with Title XIX of the Social Security Act."[10] (emphasis supplied).
 
 
 103
 The foregoing holding was prefaced by this significant statement:
 
 
 104
 "But, even if we assume, as do the Plaintiffs, that abortion payments are clearly authorized under Title XIX of the Social Security Act, nevertheless, Congress has given the States great latitude in establishing standards for the administration of the various plans, under the doctrine of a 'Scheme of cooperative federalism.' "[11]
 
 
 105
 The distilled essence of the holding below is that Title XIX does not, Per se, require a Medicaid state to pay for a non-therapeutic abortion, and accordingly the Pennsylvania Regulations denying payment for such an abortion does not conflict with Title XIX.
 
 
 106
 The distilled essence of the majority's holding is that Title XIX, Per se, requires a Medicaid state to pay for a non-therapeutic abortion "once the state has decided to finance full-term delivery and therapeutic abortion as methods for the treatment of pregnancy."
 
 
 107
 The Achilles' heel of the majority's holding is its Non sequitur application of recent Supreme Court decisions,[12] in which no issue as to the sweep of Title XIX was involved, and the critical question presented related Only to constitutional challenges to state statutes making performance of a non-therapeutic abortion a crime.
 
 
 108
 The majority's application of these Supreme Court decisions is manifested by its following statement:
 
 
 109
 "Since the decisions of the Supreme Court have forced the states to include elective abortion in the legal practice of medicine Through the second trimester of pregnancy, We also hold that the statute (Title XIX) requires Pennsylvania to fund abortions through the end of the second trimester." (emphasis supplied).
 
 
 110
 It need only be said on the score of the foregoing, that the 1973 Supreme Court decisions, which make legal a physician's performance of an elective abortion, cannot be utilized to construe the earlier enacted Title XIX[13] as Requiring a Medicaid state to pay the expenses of such an abortion, albeit these decisions are applicable to the presented issue of constitutionality of the Pennsylvania Regulations which has been avoided by the majority.
 
 
 111
 As earlier noted, two other circuits which have spoken to the Title XIX issue have subscribed to the holding of the court below and expressly refused to subscribe to the view espoused by the majority.
 
 
 112
 In Doe v. Rose, 499 F.2d 1112 (10th Cir. 1974), constitutional and statutory challenges were presented to the Utah Department of Social Services' "informal policy" concerning abortions.
 
 
 113
 The "informal policy" provided that a pregnant woman was not entitled to an abortion at the expense of Utah's Medicaid program without prior approval as a "therapeutic abortion" by the Executive Director of the Department. The "informal policy" defined a "therapeutic abortion" as one necessary to save the life of the expectant mother or to prevent serious and permanent impairment to her physical health, and none other.
 
 
 114
 The district court granted the plaintiffs' request for an injunction restraining enforcement of the "informal policy" on both statutory and constitutional grounds. The Tenth Circuit, on review, affirmed on the constitutional grounds only, declaring that it preferred to do so for these reasons:
 
 
 115
 "At the outset, so far as we are advised the applicable federal statutes regarding Medicaid make no mention, as such, of abortions. Hence, we lack specific guidance as to whether Congress intended that abortions be covered by Medicaid and, if so, more critically, Which abortions were to be covered by medicaid benefits. . . .
 
 
 116
 "The implementing state statutes of Utah, as well as the latter's state plan, submitted to and approved by the federal authorities, also make no mention, as such, of abortions. Hence, this is not an instance where the administrative policy under attack is mandated by either state or federal statute. By the same token, In our view there is nothing in either the federal or state statutes which specifically bars the policy here followed by Rose. In this regard, we are mindful of the Supreme Court's preference for statutory, as opposed to constitutional, resolution of welfare controversies. See Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970). Nevertheless, in light of the applicable statutes' complete silence on the abortion question, we prefer to dispose of the present appeal on constitutional grounds, rather than by any strained effort to show that the policy in question is, in effect, though not in so many words, prohibited by either federal or state statute. . . . " 499 F.2d at 1114-1115. (emphasis supplied).
 
 
 117
 The Sixth Circuit, in Roe v. Ferguson, 515 F.2d 279 (6th Cir. 1975), reversed the district court's holding that Title XIX was contravened by administrative rulings by the Auditor of the State of Ohio and an Ohio statute which prohibited reimbursement for elective abortions to state Medicaid recipients.
 
 
 118
 In doing so, the Court expressly declared its accord with Doe v. Rose, supra, and the holding of the court below in the instant case, on the Title XIX issue, in the following statement:
 
 
 119
 "We are in accord with the decisions which have found no conflict between state restrictions of Medicaid payments to elective abortions and the provisions of the Social Security Act. There is no indication that Congress intended to require the furnishing of abortion services not required for the preservation of the health of the woman at a time when the performance of such abortions was illegal in most jurisdictions. In view of the disfavor shown toward abortions in other legislation, we are reluctant to infer that Congress intended to include required coverage for such controversial services without even mentioning the subject. When Congress passed the Family Planning Services and Population Research Act of 1970, 42 U.S.C. §§ 300a et seq. providing funds to states opting to participate in creating comprehensive programs of family planning services, abortion was specifically excluded as a means of family planning to be recognized under the Act. 42 U.S.C. § 300a-6.
 
 
 120
 "In establishing the Legal Services Corporation system, Congress again provided that no funds of the Corporation could be used for legal assistance for those seeking to procure a nontherapeutic abortion. 42 U.S.C. § 2996f(b) (8).
 
 
 121
 "In view of this evidence of the Congressional attitude toward abortion as a family planning technique or as an acceptable medical service in general, it is difficult to construe the silence of Congress in Title XIX as an endorsement of the view that nontherapeutic abortions are included in the 'necessary medical services' required to be furnished by a state participating in Medicaid. This is not to say that Congress may constitutionally exclude such abortion services from coverage in the Medicaid program. In the absence of a legislative history indicating a contrary position, however, we cannot say that the statute itself prohibits such an exclusion." 515 F.2d at 283 (emphasis supplied).[14]
 
 
 122
 As earlier stated, the majority's holding is nourished Only by a single district court case Roe v. Norton, supra. There, the narrow issue presented was whether Title XIX Prohibited "federal reimbursement for the expenses of an (elective) abortion," and thus Compelled a Medicaid state to deny reimbursement for such an abortion. The issue arose by reason of the adoption of a regulation by the Connecticut Welfare Department banning reimbursement for non-therapeutic abortions because of its belief that it was Compelled to do so by Title XIX.[15] The district court ruled that "Title XIX must be construed to Permit payment for elective abortions." In doing so, the district court further held that the Title "must be construed . . . to Prohibit state regulations that impair a woman's exercise of her right, in consultation only with her physician, to have an (elective) abortion."[16]
 
 
 123
 It must immediately be noted that the stated further holding is dictum under the prevailing circumstances.
 
 
 124
 Coming now to the majority's disregard of the views expressed by the Solicitor General of the United States, and the federal agency which administers the Medicaid program, on the score of the reach of Title XIX, in its holding that "the Pennsylvania Regulations are inconsistent with Title XIX":
 
 
 125
 As already stated, the Solicitor General in his Amicus Curiae Memorandum[17] specifically opined that "the Social Security Act does Not require a federally-funded state medicaid program to pay for abortions that are not medically indicated," and, the federal agency which administers the Medicaid program, in a statement on its "position" on abortion,[18] made it clear that a Medicaid state has the option of funding abortions, and if it does, "the federal Government shares the cost with the State."
 
 
 126
 A more recent statement made by the Social and Rehabilitation Service, under which the Medical Services Administration operates, further reflects the Government's view that Title XIX does not Exclude non-therapeutic abortions.
 
 
 127
 The statement declares in relevant part that "under Title XIX, federal financial participation is Available for Any abortions For which the state welfare agency provides."[19] (emphasis supplied).
 
 
 128
 The foregoing evidences the federal Government's view that Title XIX Neither prohibits, nor requires a Medicaid state's payment for non-therapeutic abortions, and that such states are free to either provide or deny at their option medical assistance for such an abortion.
 
 
 129
 It is undisputed that the Government has pursued a policy of sharing in a state's funding of non-therapeutic abortions, pursuant to its stated position.
 
 
 130
 The majority's disregard of the stated views of the federal agencies concerned with administration of Title XIX, contravenes the settled rule that construction of a statute by an agency charged with its administration should be accorded great deference, absent compelling indications that it is clearly wrong.[20]
 
 This, too, must be said:
 
 131
 It cannot be gainsaid that Title XIX does not make any reference to abortions therapeutic or elective and that its legislative history is similarly silent on that score.
 
 
 132
 In recognition of that fact, the majority concededly reached its holding as to the force of Title XIX with respect to abortions therapeutic and elective by "interpreting" Title XIX to support its conclusion. In doing so it said:
 
 
 133
 "It is Impossible to believe that in enacting Title XIX Congress intended to freeze the medical services available to recipients as those which were legal in 1965."
 
 
 134
 The quoted statement clearly falls into the category of argument criticized as a "departure from ordinary principles of statutory interpretation," in the recent case of Burns v. Alcala, --- U.S. ---, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975).[21]
 
 
 135
 The same is true with respect to this further conclusory statement of the majority:
 
 
 136
 "We therefore conclude that Once the state has decided to finance full-term delivery and therapeutic abortion as methods for treatment of pregnancy, it Cannot decline to finance non-therapeutic abortions without violating the requirements of Title XIX." (emphasis supplied)
 
 
 137
 It may be noted at this juncture that the stated construction of Title XIX is sharply at odds with that of the Solicitor General in his Amicus Curiae Memorandum.
 
 
 138
 In spelling out his views as to "the extent of the 'medical assistance' which must be provided" under Title XIX, the Solicitor General said:
 
 
 139
 "Furthermore, a participating state Need not pay for every kind of medical treatment encompassed within those five categories. The state is required only to set 'reasonable standards . . . for determining . . . the extent of medical assistance . . . Consistent with the objectives of (Title XIX)' 42 U.S.C. 1396a(a)(17)," and, "(w)e disagree" with the contention "that the denial of assistance with respect to non-medically indicated abortions is not 'reasonable' under 42 U.S.C. 1396a(a)(17)."
 
 
 140
 I agree with the Solicitor General's rejection of the contention that the denial of assistance with respect to nonmedically indicated abortions is not reasonable under Title XIX.
 
 
 141
 The Title's use of the phrase "amount, duration and scope of services" in its various provisions, indicates that "Congress anticipated that states would limit the types of services they covered . . . "[22]
 
 
 142
 In summary, I would for all the reasons stated in the foregoing discussion, affirm the holding of the court below that the "Pennsylvania Regulations do not conflict with Title XIX of the Social Security Act." (emphasis supplied).
 
 
 143
 II. THE CONSTITUTIONAL ISSUE.
 
 
 144
 The court below held that the Pennsylvania Regulations "are unconstitutional because they are in violation of the Equal Protection Clause since they create an unlawful distinction between individual women who choose to carry their pregnancies to birth, and indigent women who choose to terminate their pregnancies by abortion."[23]
 
 It premised its holding on these grounds:
 
 145
 "Under traditional Equal Protection standards, once the State chooses to pay for medical services rendered in connection with the pregnancies of some indigent women, it cannot refuse to pay for the medical services rendered in connection with the pregnancies of other indigent women electing abortion, unless the disparate treatment supports a legitimate State interest,"[24] and, "the State's decision to limit coverage to 'medically indicated' abortions, as arbitrarily determined by it, is a limitation which promotes no valid State interest."[25]
 
 
 146
 I would reverse the unconstitutionality holding of the court below, albeit the Eighth and Tenth Circuits and four district courts[26] have held unconstitutional regulations and statutes similar to the Pennsylvania Regulations, and no court has held to the contrary.[27]
 
 
 147
 I agree with the dissenting view below that "there is no constitutional requirement that the State must finance exercise of a 'fundamental' right, nor does a classification which distinguishes between medically necessary and non-necessary abortions offend the Equal Protection Clause."[28]
 
 
 148
 The sum of the holding of the court below is that since Pennsylvania's Medicaid program pays for medical services incident to full-term delivery, and/or therapeutic abortions, it violates the Equal Protection Clause when it denies payment for an elective abortion.
 
 
 149
 The holding reflects the court's subscription to the plaintiffs' contention that an elective abortion is one way of handling a pregnancy and accordingly such an abortion falls within the category of "necessary medical care" extended by Pennsylvania to pregnant eligibles. It also reflects rejection of Pennsylvania's contentions that its Medicaid program provides only for extension of "necessary medical care," and its payment for a full-term delivery and/or therapeutic abortion properly fall within the range of reasonably-defined "necessary medical care" for the condition of pregnancy, and that a non-therapeutic (elective) abortion does not do so.
 
 
 150
 Discussion of the constitutional issue must be prefaced by these observations with respect to the present state of the law as indicated by Supreme Court decisions:
 
 
 151
 A woman has a constitutional right to terminate her pregnancy during its first two trimesters. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).
 
 
 152
 The Supreme Court did not hold in these cases that a state is under a duty to finance the exercise of the constitutional right to an elective abortion, nor has it ever held that Medical care in general is a fundamental right, albeit it has recognized that "medical care is . . . 'a basic necessity of life' to an indigent . . . ."[29]
 
 
 153
 The Supreme Court has declined to designate welfare in general as a fundamental right,[30] although it has recognized the critical importance of welfare as providing "the very means by which to live."[31]
 
 
 154
 The cornerstone of the plaintiffs' contention is that the Regulations, In the absence of a compelling state interest, violate the Equal Protection Clause in that they discriminatorily divide pregnant eligibles Into two classes one which chooses to carry pregnancy to full term delivery, and another which elects to terminate pregnancy for non-therapeutic reasons.
 
 
 155
 The fallacy of the stated contention is that it disregards the fact that Pennsylvania in its medicaid program has committed itself to extend medical care to its eligibles only where "necessary medical care" is required. The only classification made by the Regulations is between necessary medical care and non-necessary medical care. Such a classification does not call into play the "compelling state interest" test. It is subject only to the "reasonable basis", otherwise stated, "rational basis" test, spelled out in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). There, the Court held that a state regulation which reduced family welfare benefits did not violate the Equal Protection Clause. In doing so it said in relevant part at page 485, 90 S.Ct. at page 1161:
 
 
 156
 "In the area of economics and Social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it Results in Some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (31 S.Ct. 337, 55 L.Ed. 369). 'The problems of government are practical ones and may justify, if they do not require, rough accommodations illogical, it may be, and unscientific.' Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70 (33 S.Ct. 441, 57 L.Ed. 730)." (emphasis supplied).
 
 
 157
 I am of the opinion that the classification between "necessary medical care" and "non-necessary medical care" survives the application of the "reasonable basis" and/or "rational basis" tests.
 
 
 158
 It cannot be gainsaid that full-term delivery and/or therapeutic abortions reasonably and rationally fall within the category of "necessary medical care" for a pregnant woman, and that an "elective" or non-therapeutic abortion does not do so.
 
 This, too, must be said:
 
 159
 The holdings of unconstitutionality in the Eighth and Tenth Circuit cases, cited in note 26, rested in large part on the analysis of the three-judge district court in Klein v. Nassau County Medical Center[32] in holding that providing financial assistance to pregnant mothers who carry their babies to full term and delivery while denying financial assistance to mothers who choose instead an "elective" abortion denied the latter mothers the equal protection of the laws guaranteed by the Fourteenth Amendment. That analysis, in only slightly different terms is also advanced before this court by the plaintiffs. The persuasiveness of the analysis depends upon a willingness to accept the posture of the mother as one in which she is required to "resign her freedom of choice" not to bear the fetus term.
 
 
 160
 There is both a verbal and an emotional appeal about this argument. But the legal and economic fact as well is not precisely stated in it. The compulsion to "resign her freedom of choice" derives not from the state policy but from the mother's poverty. The equal protection clause as sought to be used here would require this court to determine that the state, having undertaken to relieve Some of the burdens of poverty is required to remedy All of poverty's burdens. The state, with some support from the medical profession, in reaching a determination of what is medically necessary, and unquestionably with support based on the prevailing mores of the majority of our society, has decided to remedy that problem of poverty which is represented by the costs of medical care during pregnancy and the delivery of the baby. From society's point of view, there are a variety of arguments for the wisdom of such public expenditure, most based upon the desirability of preserving the life and well being of the expectant mother and of assuring healthy babies. The state, thus far, has not concluded that avoidance of unwanted babies is as important as avoidance of unhealthy babies. This may well be an improper determination of values. A court may regard the two objectives as of equal magnitude and conclude that the state is quite wrong. It would be an error, however, for courts to displace the value judgment of the legislature with the value judgment of the court absent a finding that the value judgment of the legislature is proscribed by the Constitution.
 
 
 161
 There are probably no programs of the state or federal government affording financial assistance that do not contain within them, sometimes unarticulated, norms of conduct that are prerequisite to receiving the assistance. Surely the unavailability of unemployment compensation to one who quits his or her job while affording it to one who has labored to retain it but has been laid off serves as an inducement to refrain from quitting. For the well-off person in our society, with some independent reserves, that inducement is irrelevant, and the individual is free to quit. For the low-income employee, that policy may well prevent the person from refusing to continue in employment that has become, perhaps, personally unbearable.
 
 
 162
 The examples could be multiplied. In their determinations of appropriate contexts of financial aid the federal and state legislatures have reflected societal prejudices about human conduct. These differentially affect the poor, who are dependent upon governmental assistance, and the more affluent, who are not. To require the states to forego this kind of policymaking would be to require the states to choose between leaving the pain of poverty unabated or to provide assistance neutral in its assertion of values. Not only would this seem to go well beyond present decisions of the Supreme Court of the United States in interpreting the equal protection clause but it would, if embraced, likely place financial assistance to the poor in many contexts beyond what is politically feasible, thus leaving all the poor worse off than under the present value distinctions made.
 
 
 163
 Only in the areas in which the poor are faced with governmentally imposed financial burdens divorce court fees, appeal transcript fees has the Supreme Court found that legislatures are constitutionally bound to relieve the poor of the burdens of their poverty. The instant case might be such a case, for example, if the Pennsylvania legislature had established a minimum doctor's charge, or even more clearly, a state license fee for an elective abortion. But in the instant case, the burden carried by the indigent mother who desires, an elective abortion has not been made greater by the state. It has simply not been eased, whereas the state has eased the burden of the costs of pregnancy for the mother who wishes to carry the fetus until term. That kind of distinction in affordance of financial assistance has not till now and should not be subject to judicial supervision under the aegis of the Fourteenth Amendment.
 
 
 164
 The Equal Protection Clause does not provide cure-all panaceas, or Utopian solution, with respect to all the problems incident to the condition of poverty, e.g. inability of an indigent pregnant woman to privately finance her non-medically necessary (elective) abortion. Otherwise stated, the Equal Protection Clause cannot be construed to afford a guarantee against All the incidents of the condition of poverty.
 
 
 165
 III. THE DISCRIMINATORY ADMINISTRATION OF THE REGULATIONS.
 
 
 166
 As earlier stated, I would enjoin enforcement of the Regulations on the ground that they are being administered in violation of the Equal Protection Clause in that They are not enforced against indigents who threaten suit when they are denied funding of an elective abortion, and They are enforced against those who do not threaten suit.
 
 
 167
 It has long been settled that State administrative procedures which are Per se valid and constitutional may, nevertheless, be enjoined when they are unconstitutionally applied. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). More recently, the Supreme Court has stressed that "a law non-discriminatory on its face may be grossly discriminatory in its operation." Williams v. Illinois, 399 U.S. 235, 242, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970); Griffin v. Illinois, 351 U.S. 12, 17, n.11, 76 S.Ct. 585, 100 L.Ed. 891 (1956).
 
 
 168
 The Pennsylvania Department of Justice concedes[33] that "it entered into a policy of consenting to the granting of the requested relief (funding of an elective abortion) on an individual basis when . . . litigation was threatened," and it cites in corroboration a Stipulation detailing its policy filed in another action.
 
 
 169
 In making that concession, the Justice Department urges that "(t)his was Not a policy of the Pennsylvania Department of Welfare in any way modifying the uniform application of the Pennsylvania Medicaid Regulations. This was, and still is, merely a policy of the lawyers for the defendant in pending litigation . . ."
 
 
 170
 The fact that Pennsylvania pays for an elective abortion when suit is threatened or pending establishes discriminatory administration of its Regulations. It Is utterly irrelevant that payment for an elective abortion is made At the instance of "the lawyers for the defendant" and Not by way "of the policy of the Department of the Pennsylvania Department of Welfare."
 
 
 171
 "The play's the thing."*
 
 
 172
 The sum total of the existing situation with respect to the Regulations is that they are enforced as to some pregnant indigents seeking elective abortions and denied as to others in the same category.
 
 
 173
 Standing alone, and independently so, the stated circumstances constitute violation of the Equal Protection Clause of the Fourteenth Amendment.
 
 
 174
 I would for this reason remand the cause to the court below with directions to enjoin enforcement of the Pennsylvania Regulations in light of their Administration in violation of the Equal Protection Clause of the Fourteenth Amendment.
 
 
 175
 Judge Gibbons joins in this dissenting opinion except as to Part III.
 
 ADAMS, Circuit Judge (dissenting):
 
 176
 I respectfully dissent from the majority. In my judgment, the Pennsylvania regulations are not incompatible with the scheme of medical aid to indigents envisaged by Congress in Title XIX of the Social Security Act. In addition, I do not believe that the Pennsylvania schedule for reimbursements, that includes only medically indicated abortions, violates the Constitution.[1]
 
 
 177
 These conclusions are grounded on reasons set forth in the dissenting opinion of Judge Kalodner here, and that of Judge Weis in the district court, and are based also on the various authorities referred to in those opinions.
 
 
 
 [1]
 The plaintiffs sought both injunctive and declaratory relief. The district court granted a declaratory judgment for plaintiffs, but denied injunctive relief. Since the plaintiffs have not appealed the district court's denial of injunctive relief, this court has appellate jurisdiction. Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); 28 U.S.C. §§ 1253, 1291. The caption was changed to Doe v. Beal, pursuant to F.R.Civ.P. 25(a)(1), after the appeal had been docketed in this court
 
 
 [2]
 See note 16 below for further description of the named plaintiffs. The district court declined to certify the plaintiffs as representatives of a class. Doe v. Wohlgemuth, supra at 181-82. The plaintiffs have not appealed the refusal to grant them class-action status
 
 
 [3]
 After the district court's order was entered in the case before us, the Commonwealth of Pennsylvania enacted an "Abortion Control Act," Act No. 209, Sess. of 1974, 35 P.S. § 6601 Et seq. (Purdon's Pa.Legis.Serv. No. 4), effective date October 10, 1974. Like the regulations before us, but through rather different language, § 7 of The Abortion Control Act restricted state subsidy of elective abortions. The enforcement of § 7, together with certain other provisions of the same Act, was preliminarily enjoined by a three-judge district court in the Eastern District of Pennsylvania on October 10, 1974. Planned Parenthood Ass'n of Southeastern Pa., Inc. v. Fitzpatrick, Civ. No. 74-2440 (E.D.Pa., Oct. 10, 1974)
 At oral argument, we asked counsel for the Commonwealth whether the Abortion Control Act had superseded the regulations at issue in this suit. He represented that the Act had not, and that the Commonwealth intended to enforce the regulations independently of the fate of the Abortion Control Act. For this reason, we have concluded that this suit has not been mooted by passage of the Abortion Control Act. Cf. Abele v. Markle, 369 F.Supp. 807, 809 (D.Conn.1973).
 
 
 [4]
 62 P.S. § 403 (1968) empowers the Department to establish "regulations, rules, and standards" as to the eligibility for assistance
 
 
 [5]
 Where code sections are referred to in this opinion without accompanying title references, "42 U.S.C.A. § ---- (1974)" will be implicit
 
 
 [6]
 The defendants in the case before us do not deny that the plaintiffs' constitutional arguments are sufficiently meritorious to confer jurisdiction on the district court under § 1343(3). In view of the federal lower court decisions holding unconstitutional regulations similar to the Pennsylvania procedures now before this court, the constitutional "claim . . . (is) of sufficient substance to support federal jurisdiction (under 28 U.S.C. § 1343(3))." Hagans v. Lavine, supra at 536, 94 S.Ct. at 1378. See, E. g., Wulff v. Singleton, 508 F.2d 1211 (8th Cir. 1974); Doe v. Westby, 383 F.Supp. 1143 (D.S.D.1974), and cases cited therein at 1145, Vacated and remanded For further consideration in light of Hagans v. Lavine, supra, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1975)
 
 
 [7]
 The March 17, 1975, order of the Supreme Court (No. 74-684) reads, Inter alia, As follows:
 "The judgment is vacated and the case is remanded to the United States District Court for the District of South Dakota for further consideration in light of Hagans v. Lavine, 415 U.S. 528, 543-545 (94 S.Ct. 1372, 39 L.Ed.2d 577) (1974)."
 In Doe v. Westby, the district court's failure to address the statutory question may be explained by the parties' failure to raise it. See Doe v. Westby, supra At 1144.
 
 
 [8]
 Circuit Judge Weis dissented. 376 F.Supp. at 192
 
 
 [9]
 In Rosado, the Court struck down the New York legislation, even though no express language in § 402(a)(23) required that result:
 "These conclusions, if not compelled by the words of the statute or manifested by legislative history, represent the natural blend of the basic axiom that courts should construe all legislative enactments to give them some meaning with the compromise origins of § 402(a)(23), set forth above."
 Rosado, supra 397 U.S. at 415, 90 S.Ct. at 1219. See also King v. Smith, supra, 392 U.S. at 332, 88 S.Ct. at 2141 (relying on "(t)he pattern of this legislation," and "(t)he underlying policy and consistency in statutory interpretation").
 
 
 [10]
 The phrases "categorically needy," referring to categories of recipients described in § 1396a(a)(10)(A), and "medically needy," referring to recipients described in § 1396a(a)(10)(C), appear in the Regulations. 45 C.F.R. § 249.10(a)(1) (Rev.ed., Oct. 1, 1973). The categorically needy are persons receiving aid or assistance under Titles I, X, XVI, Part A of Title IV, and persons receiving supplemental income benefits under Title XVI. § 1396a(a) (10)(A). The medically needy are persons who are not described in § 1396a(a) (10)(A) "and who do not meet the income and resources requirements of the appropriate State plan, or the supplemental security income program under subchapter XVI of this chapter, as the case may be, as determined in accordance with standards prescribed by the Secretary (i) for making medical assistance available to all individuals . . . who have insufficient income and resources to meet the costs of necessary medical and remedial care and services . . . ." § 1396a(a)(10)(C)
 Pennsylvania provides services to the "medically needy." 62 P.S. § 441.1 reads as follows:
 "The following persons shall be eligible for medical assistance:
 "(1) Persons who receive or are eligible to receive cash assistance grants under this article;
 "(2) Persons who meet the eligibility requirements of this article for cash assistance grants except for citizenship durational residence and any eligibility condition or other requirement for cash assistance which is prohibited under Title XIX of the Federal Social Security Act; and
 "(3) The medically needy."
 This last phrase is not otherwise defined, except by 62 P.S. § 442.1:
 "A person shall be considered medically needy if he:
 "(1) Resides in Pennsylvania, regardless of the duration of his residence or his absence therefrom; and
 "(2) Meets the standards of financial eligibility established by the department with the approval of the Governor. In establishing these standards, the department shall take into account (i) the funds certified by the Budget Secretary as available for medical assistance for the medically needy; (ii) pertinent Federal legislation and regulations; and (iii) the cost of living."
 
 
 [11]
 PMAP extends coverage to the medically needy, giving them services (1) through (5) the same care and services as it is required to give the categorically needy. Doe v. Wohlgemuth, supra at 182-83
 
 
 [12]
 Two district courts agree with the conclusion that Congress intended to fund only "necessary" medical expenses. Roe v. Ferguson, 389 F.Supp. 387 (S.D.Ohio, 1974), Rev'd, 515 F.2d 279 (6th Cir., 1975); Klein v. Nassau Cty. Med. Ctr., 347 F.Supp. 496, 499 (E.D.N.Y.1972), Vacated and remanded for further consideration in light of Roe v. Wade and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). A third district court was more troubled by the absence of "necessary" as a limitation on available medical services. Roe v. Norton, D.C., 380 F.Supp. 726, at 728-29. The Roe v. Norton court appears to have overlooked § 1396a(a)(31), but it made the important observation that Medicare (Title XVIII) excludes payment for services "which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C.A. § 1395y(a)(1) (1974). Roe v. Norton, supra at 729. The court found the legislative history of Medicare and Medicaid to support "a common interpretation of both titles." Id
 
 
 [13]
 See note 14 below
 
 
 [14]
 The original Act required participating states to move toward, and eventually to furnish, "comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources," Social Security Amendments of 1965, Title XIX, § 1903(e), 79 Stat. 350. In response to the rapidly inflating cost of medical services, this section was repealed in 1972, Social Security Amendments of 1972, Title II, § 230, 86 Stat. 1410, but Congress made clear that in repealing § 1903(e) it did not mean to alter the essential goals of the Medicaid system:
 "Your committee also concluded that there is no simple or single solution to the problems now existing in the health care field which adversely affect these programs. But your committee does believe that there are modifications which can and should be made in these programs changes which, while perhaps not very significant taken singly, as a whole, show great promise for making significant advances in accomplishing the goal of making these programs more economical and more capable of carrying out their original purposes."
 H.R.Rep.No.92-231, 92nd Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News, pp. 4989, 4994. See Comment, Abortion on Demand in a Post-Wade Context: Must the State Pay the Bills?, 41 Fordham L.Rev. 921, 932 (1973). It is, therefore, proper to conclude that the original purpose of protecting the physician's discretion in treatment was not intended to be altered by the 1972 repeal of § 1903(e). The 1972 amendments do, however, demonstrate a congressional intent that the Medicaid funds be used in the most economical manner possible.
 
 
 [15]
 We make this argument for illustrative purposes only. Although dental services may be provided under Medicaid, § 1396d(a)(10), Pennsylvania does not do so. See note 11, Supra
 
 
 [16]
 The district court opinion does not indicate whether all the plaintiffs are categorically needy. On reading the complaint and accompanying affidavits, we have found that six of the 11 named plaintiffs receive AFDC, while five receive "Public Assistance." AFDC is part A of Title IV; its recipients are therefore "categorically needy" and the state must provide them with services (1) through (5) of § 1396d(a). §§ 1396a(a)(10)(A) and (13)(B). The services listed in the text are clauses (5), (1), (2), and (4)(C), respectively, of § 1396d(a). The plaintiffs receiving Public Assistance, on the other hand, are not categorically needy, but only medically needy. The state could, therefore, deny them Medicaid altogether or provide services other than those listed in the text. See pp. 616-617, Supra. Nevertheless, Pennsylvania extends equal coverage to the medically and categorically needy. See note 11, Supra
 
 
 [17]
 See note 15, Supra. A similar argument appears in Comment, Supra note 14, at 937, n. 106
 
 
 [18]
 New York's Medicaid program, for example, appears to exclude elective cosmetic surgery. See Klein, supra note 12, at 500. We have not been apprised whether Pennsylvania's does so or not
 
 
 [19]
 See note 14, Supra
 
 
 [20]
 This court is not the first one to relate "necessary" to the conditions to be treated, rather than to the choice of treatment. See Roe v. Norton, supra at 729, Klein v. Nassau Cty. Med. Ctr., supra note 12, at 500
 
 
 [21]
 The range of the doctor's discretion is in turn defined by each state's definition of the legal practice of medicine. See p. 620, Supra
 
 
 [22]
 In the Amicus Curiae Memorandum of the United States, filed in New York, etc. v. Klein et al., 412 U.S. 925, 93 S.Ct. 2747, 37 L.Ed.2d 152 (1973), and relied on extensively in Judge Kalodner's dissent, this language appears at pages 7-8:
 "But the state appellants have properly refused to intrude on the physician's judgment; they are completely 'guided by the ruling of the woman's physician as to whether an abortion is medically indicated' (J.S. 11). Thus the state appellants, in administering the New York medicaid program, simply treat abortions in the same manner as other medical services: they defer to the medical judgment of the attending physician. If in the judgment of the patient's physician a particular medical service whether an abortion or an appendectomy is advisable to preserve health, that medical service is covered by the New York medicaid program.
 "The court below misunderstood the crucial role played by the woman's physician in the New York scheme. . . . (T)he district court simply assumed that the abortions sought were not medically indicated (J.S.App. A, 4a), but this was a medical judgment which the court was not in a position to make. Contrary to the court's assumption, it is possible that an attending physician would have concluded that an abortion was medically indicated with respect to one or more of the appellees.
 "At bottom, therefore, appellees' argument apparently is that the Social Security Act requires reimbursement of the costs of all medically feasible abortions performed merely upon the demand of pregnant women. We see no statutory basis for this contention. An abortion is a serious medical matter which requires an exercise of medical judgment. A state need not provide medical assistance with respect to other medical services such as, for example, a tonsillectomy merely upon the patient's own request, and there is no apparent reason why abortions should be treated differently."
 The Memorandum also quoted from Doe v. Bolton, supra, and Roe v. Wade, supra, as follows at pp. 8-9:
 "Our conclusion is reinforced by this court's recent statements concerning the nature of the medical judgment here in question and the importance of that judgment to the expectant mother. In Doe v. Bolton, No. 70-40, decided January 22, 1973, slip op. at 11-12 (410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201), the Court stated:
 ' * * * the medical judgment may be exercised in the light of all factors physical, emotional, psychological, familial, and the woman's age relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.'
 "And in Roe v. Wade, No. 70-18, decided January 22, 1973, slip op. at 49 (410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147), the Court emphasized the critical importance of the attending physician's role by concluding that, as a constitutional matter, during the first trimester of pregnancy 'the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.' We agree that the role of the attending physician is and should be an important one, and we therefore believe that the state appellants have acted reasonably in preserving that role under the medicaid program."
 If the plaintiffs' physicians do not approve their desired abortions, such abortions will not qualify under Title XIX. The procedures, with their requirements for examination by two additional physicians, as well as the physician of each plaintiff, etc., are clearly not supported by the above Memorandum.
 Also, the M.S.A. of HEW policy, set forth in note 5 at 376 F.Supp. 179 and at 1 CCH Medicare and Medicaid Guide P 14,511, also relied on in Judge Kalodner's dissent (see, for example, note 18 at page 16), does not support such procedures. It is noted that P 14,515 of 1 CCH Medicare and Medicaid Guide, entitled "Equality of Medical Care," contains this wording of CCH, Inter alia:
 "The regulations (Reg. § 249.10(a)(6), P 21,610) provide that the medical and remedial care and services made available to any categorically needy individual included under the plan will not be less in amount, duration, or scope than those made available to other individuals included under the program, . . . ."
 
 
 [23]
 As stated by the Supreme Court in Doe v. Bolton, supra, 410 U.S. at 192, 93 S.Ct. at 747:
 "Whether . . . 'an abortion is necessary' is a professional judgment that the . . . physician will be called upon to make routinely."
 
 
 [24]
 See Roe v. Wade, supra, 410 U.S. at 164, 93 S.Ct. 705; see also note 21, Supra
 
 
 [25]
 Because the medical risk to a pregnant woman is somewhat enhanced during the second trimester, see Roe v. Wade, supra at 163, 93 S.Ct. 705, the state might require second trimester abortions funded by PMAP to be performed under physical conditions E. g., in a hospital which protect the health of the aborting woman. § 1396a(a)(19). See also Roe v. Wade, supra at 163, 93 S.Ct. 705; Doe v. Bolton, supra, 410 U.S. at 194-95, 93 S.Ct. 739
 
 
 [26]
 Cf. Philbrook v. Glodgett, --- U.S. ---, at ---, note 8, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975)
 
 
 [1]
 376 F.Supp. 173, 186 (W.D.Pa.1974)
 
 
 [2]
 Id. at 191
 
 
 [3]
 Judge Weis stated: "I also concur in the court's holding that the State regulations are not in conflict with the federal statute." 376 F.Supp. at 192 n.1
 
 
 [4]
 The "Memorandum" was filed in Commissioner of Social Services of New York et al. v. Klein And Nassau County Medical Center et al. v. Klein et al., 412 U.S. 925, 93 S.Ct. 2748, 37 L.Ed.2d 152 (1973) (hereinafter cited as Amicus Curiae Memorandum). It recites that "(t)his memorandum is filed in response to the Court's invitation to the Solicitor General to file a memorandum expressing the views of the United States on the statutory issues." Id. at 1
 
 
 [5]
 1 CCH Medicare and Medicaid Guide P 14,511; See too 41 Penna. Bulletin 2207 n.4 (Sept. 29, 1973) (Opinion Letter, dated Aug. 6, 1973, from Israel Packel, Att'y Gen. of Penna., to Helene Wohlgemuth, Sec'y of Penna. Dept. of Public Welfare, on the Effect of United States Supreme Court Decisions on Department of Public Welfare Medical Assistance Regulations on Abortions ), noted in the opinion of the district court. 376 F.Supp. at 178 n.5
 
 
 [6]
 "Medical assistance" is functionally defined by the Social Security Act in terms of part or total payment for seventeen different types of services reimbursable under the Medicaid Program. 42 U.S.C. § 1396d(a)
 
 
 [7]
 See Stevens and Stevens, Medicaid: Anatomy of a Dilemma, 35 Law & Contemp.Prob. 348, 363 (1970) (hereinafter cited as Stevens)
 
 
 [8]
 1 CCH Medicare and Medicaid Guide, P 14,010
 
 
 [9]
 Id. at P 15,632; 62 P.S. §§ 432, 441.1
 
 
 [10]
 376 F.Supp. at 185-86
 
 
 [11]
 Id. at 184
 
 
 [12]
 Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)
 
 
 [13]
 Title XIX was first enacted in 1965, and amended in 1972
 
 
 [14]
 It must be noted that the Court in Roe remanded the case for consideration of the constitutional issue by a three-judge court, and that the Tenth Circuit in Doe v. Rose ruled that the denial of benefits for a non-therapeutic abortion was unconstitutional, albeit, it reversed the district court's ruling there that the denial contravened Title XIX. The stated unconstitutionality ruling will be discussed later
 
 
 [15]
 380 F.Supp. 726, 728 n.2
 
 
 [16]
 Id. at 730
 
 
 [17]
 See Note 4, Supra
 
 
 [18]
 The Medical Assistance Services Administration in the Social and Rehabilitation Service of the Department of Health, Education, and Welfare, which administers the Medicaid aspect of the Social Security Act, made the following response to an inquiry of the Attorney General of Pennsylvania anent federal sharing with a Medicaid state of abortion payments:
 "The position taken by the Medical Services Administration on abortion is that the Social Security Act and the HEW Regulations provide for Federal matching of State expenditures for all kinds of medical care and services, including inpatient hospital services, outpatient hospital services, physician services, drugs, etc. If the State Medicaid program pays for these services, Whether for abortion, or any other medical procedure, the Federal Government shares the costs with the State." (emphasis supplied). See too, note 5, Supra.
 
 
 [19]
 Roe v. Norton, 380 F.Supp. 726, 730 (D.Conn.1974) (citing the view of an associate commissioner of the Social and Rehabilitation Service)
 As another indication of the Government's view that Title XIX, as enacted, Permits but does not Require funding of non-therapeutic abortions, the Social and Rehabilitation Service has proposed to redefine the Title's "family planning services" provisions so that "neither therapeutic nor non-therapeutic abortions are to be considered as an item of family planning services for which Federal financial participation . . . is available . . . However, Federal matching . . . is available . . . for abortions When provided under the State plan As a physician's services or otherwise." Proposed HEW rule 45 C.F.R. § 249.10(b)(4)(iii), 339 Fed.Reg. 42919, 42920 (December 9, 1974) (emphasis supplied).
 
 
 [20]
 Lewis v. Martin, 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); Rosado v. Wyman, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Federal Housing Administration v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); Bernstein v. Ribicoff, 299 F.2d 248, 253 (3d Cir.), Cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962)
 
 
 [21]
 In Burns v. Alcala, the Supreme Court was presented with the question: "whether States receiving federal financial aid under the program of Aid to Families with Dependent Children (AFDC) Must offer welfare benefits to pregnant women for their unborn children." --- U.S. at ---, 95 S.Ct. at 1182 (emphasis supplied). Viewing the matter as "one of statutory interpretation," the Court held that the term "dependent children," as presently defined by the Social Security Act does not encompass "unborn children," and therefore a state is not required by the Act to include unborn children as those eligible for AFDC benefits, but may do so, in which event federal matching funds would be available. (The Court remanded the case, however, for consideration of the constitutional issues)
 After reviewing the provisions of the Act governing AFDC eligibility, the Court stressed that its prior decisions in this area had not established "a special rule of (statutory) construction." Id. at ---, 95 S.Ct. at 1185. Lower courts, in considering the same issue, were admonished for departing from the "ordinary principles of statutory interpretation" as evidenced by their holdings that "persons who are Arguably included in the federal eligibility standard Must be deemed eligible unless the Act or its legislative history clearly exhibits an intent to exclude them from coverage, in effect creating a presumption of coverage when the statute is ambiguous." Id. at ---, 95 S.Ct. at 1184 (emphasis supplied).
 In the instant case, the majority likewise departs from the "ordinary principles of statutory interpretation" by construing Title XIX as Requiring payment for non-therapeutic abortions inasmuch as such abortions are "arguably" a "necessary medical service" reimbursable under the Medicaid Program.
 
 
 [22]
 Butler, The Right to Abortion under Medicaid. 7 Clearinghouse Review 713, 718 (1974)
 
 
 [23]
 376 F.Supp. at 191
 
 
 [24]
 Id. at 186
 
 
 [25]
 Id. at 191
 
 
 [26]
 See Wulff v. Singleton, 508 F.2d 1211 (8th Cir. 1974), cert. granted, --- U.S. ---, 95 S.Ct. 2655, 45 L.Ed.2d 692 (1975); Doe v. Rose, 499 F.2d 1112 (10th Cir. 1974); Doe v. Myatt, Civ. No. A3-74-48 (D.N.D. Jan. 27, 1975); Doe v. Westby, 383 F.Supp. 1143 (D.S.D.1974), vacated and remanded for consideration of the statutory grounds, --- U.S. ---, 95 S.Ct. 1385, 43 L.Ed.2d 648 (1975); Doe v. Rampton, 366 F.Supp. 189 (D.Utah 1973); Klein v. Nassau County Medical Center, 347 F.Supp. 496 (E.D.N.Y.1972), vacated and remanded for further consideration in light of Roe v. Wade and Doe v. Bolton. Commissioner of Social Services of State of New York v. Klein, 412 U.S. 925-26, 93 S.Ct. 2747, 37 L.Ed.2d 152 (1973)
 
 
 [27]
 The Sixth Circuit, however, remanded for consideration by a three-judge court the issue of constitutionality of an Ohio statute and administrative policy similar to the Pennsylvania Regulations after expressing its "disagreement with the Eighth Circuit's ruling in Wulff v. Singleton, 508 F.2d 1211 (8th Cir. 1974), that the unconstitutionality of this type of statute is so 'obvious and patent' as to obviate the need for a three-judge court." Roe v. Ferguson, 515 F.2d 279 (1975)
 
 
 [28]
 Id. 376 F.Supp. at 193
 
 
 [29]
 Memorial Hospital v. Maricopa County, 415 U.S. 250, 259, 94 S.Ct. 1076, 1083, 39 L.Ed.2d 306 (1974)
 
 
 [30]
 See, e. g. Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972)
 
 
 [31]
 Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970)
 
 
 [32]
 See note 26, Supra. The Klein court said:
 "The directive, and the State statute, if interpreted as mandating the Commissioner's directive, would deny indigent women the equal protection of the laws to which they are constitutionally entitled. They alone are subjected to State coercion to bear children which they do not wish to bear, and no other women similarly situated are so coerced. Other women, able to afford the medical cost of either a justifiable abortional act or full term child birth, Have complete freedom to make the choice in the light of the manifold of considerations directly relevant to the problem uninhibited by any State action. The indigent is advised by the State that the State will deny her medical assistance unless she resigns her freedom of choice and bears the child. She is denied the medical assistance that is in general her statutory entitlement, and that is otherwise extended to her even with respect to her pregnancy. She is thus discriminated against both by reason of her poverty and by reason of her behavioral choice. . . ." 347 F.Supp. at 500 (emphasis supplied).
 It must be noted that the three other district court cases cited in note 26 have also rested their holdings on the reasoning of Klein.
 
 
 [33]
 Petition for Reargument of the Pennsylvania Department of Justice
 
 
 *
 Shakespeare, Hamlet, II, c. 1601
 
 
 [1]
 It would appear, however, that the Pennsylvania regulation may not be enforced insofar as it predicates eligibility for medical assistance payments on conditions that were specifically invalidated in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), namely, a concurrence of two doctors and performance of the procedure in an accredited hospital