Eunice DODSON et al.

v.

T. M. "Jim" PARHAM, in his official capacity as Commissioner of the Georgia Department of Human Resources and Sam Thurmond, in his official capacity as Director of the Medicaid Division of the Georgia Department of Human Resources.

Civ. A. No. 76–1671A.

United States District Court, N. D. Georgia, Atlanta Division.

Jan. 13, 1977.

Richard K. Greenstein, Wayne M. Pressel, William David Arnold, Atlanta, Ga., for plaintiffs.

Stephen L. Cotter, Asst. Atty. Gen., Atlanta, Ga., for defendants.

ORDER

RICHARD C. FREEMAN, District Judge.

This is an action for declaratory and injunctive relief brought by four Supplemen-

tal Security Income recipients of benefits under Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq. [hereinafter "Medicaid"], seeking to enjoin the State of Georgia from implementation of the proposed "Controlled Medical Assistance Drug List" [hereinafter "CMADL"] on both statutory and constitutional grounds. Jurisdiction is predicated upon the existence of a substantial federal question. See 28 U.S.C. § 1331. The action is presently before the court on (1) plaintiffs' motion for an order determining that the action may be maintained as a class action, see Rule 23(c), Fed.R.Civ.P., and (2) plaintiffs' motion for a preliminary injunction. On November 29 and 30, 1976, this court conducted an evidentiary hearing and the court entered a preliminary injunction from the bench, restraining the defendants from implementing CMADL, and in accordance therewith makes the following findings and conclusions.

## CLASS CERTIFICATION

■ Plaintiffs seek to maintain this action on behalf of "all current and future recipients of Medicaid in the State of Georgia who will require drugs for the cure, mitigation or prevention of disease or for health maintenance after November 30, 1976." Defendants have not opposed class certification; it is further evident that all the prerequisites of Rule 23(a), Fed.R.Civ.P. have been satisfied, and that the action falls within the ambit of Rule 23(b)(3). See Crane v. Mathews, 417 F.Supp. 532 (N.D. Ga.1975). Accordingly, for the reasons hereinabove expressed, plaintiffs' motion for class certification is hereby GRANTED.

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Before turning to the merits of the instant motion, a brief review of the scope and nature of the Medicaid program is warranted, as well as consideration of the salient facts adduced at the evidentiary hearing.

Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq., established a cooperative federal-state program to provide payment for "necessary medical services" rendered to certain "needy individuals whose income and resources are insufficient to meet the costs of these services." In order to participate in the program, a state must submit to the Secretary of the Department of Health, Education and Welfare for his approval a so-called "state plan" which fulfills the requirements of the Act. See 42 U.S.C. § 1396a. Georgia participates in the Medicaid program under such an approved plan.

Title XIX requires that states which institute Title XIX plans provide Medicaid assistance to individuals receiving grants under the cash assistance programs of the Social Security Act,[1] the so-called "categorically needy", see 42 U.S.C. § 1396a(10)(A), and permits states, at their option, to include certain other individuals. 42 U.S.C. § 1396a(a)(10)(B). The Georgia program is limited to the categorically needy. In order for the state to receive federal funds, the state must offer certain required medical assistance services, including certain inpatient hospital services, outpatient hospital services, laboratory and X-ray services, skilled nursing facility services, early and periodic screening, diagnosis, and treatment services for children under 21, family planning services and supplies, and physician services. 42 U.S.C. § 1396a(a)(13)(B). Among the optional services which a state may offer is the component for reimbursement of prescription drugs under consideration herein. 42 U.S.C. § 1396d(a)(12).

Georgia has historically administered its prescription drug program on the basis of a drug "formulary", or in other words, a restricted list of drugs for which Medicaid will reimburse provider pharmacists. Thus,

---

1. Those programs are the Aid to Families with Dependent Children program (Title IV of the Act, 42 U.S.C. § 601, et seq.); the Supplemental Security Income program at issue herein (Title XVI of the Act, 42 U.S.C. § 1381, et seq.); and the aid to the aged, blind, and disabled programs in Guam, Puerto Rico and the Virgin Islands (Titles I, X, XIV, and XVI of the Act, 42 U.S.C. § 301, et seq., § 1201, et seq., § 1351, et seq., and § 1381, et seq., respectively).

any drug not specifically included on the list will not be reimbursed unless prior approval is granted by the defendants. The drug formulary currently being utilized in this state consists of approximately 10,000 drugs, and although reimbursement is restricted to those drugs specifically included on the list, the breadth of that list is tantamount to an open formulary with certain narrowly carved out exceptions.[2] On the other hand, CMADL, the drug formulary sought to be implemented, contains approximately 5,000 automatically reimbursable pharmaceutical drugs, although at the same time it has broadened the items reimbursable to include certain "medicine-chest" and "over-the-counter" items, such as laxatives, aspirin, and milk of magnesia. The Georgia drug component further provides that a Medicaid recipient will pay a $.50 co-payment fee on each prescription filled and reimbursement to the provider pharmacy is at a level of $2.00 over "cost."[3]

In an effort to curb certain excesses and abuses of the Georgia Medicaid prescription drug component, defendants engaged the Pharmacy School of the University of Georgia to conduct an exhaustive analysis of available pharmaceutical products by experts to consider certain criteria: (1) therapeutic effectiveness, (2) safety, and (3) only when the products were found to be both effective and safe, to consider the relative cost. At the end of December, 1975, two doctors of pharmacy and professors at the School, Doctors Moore and Mikael, after intensive studies of similar formularies, drug package inserts, relevant medical literature, and other reference materials, submitted a report and proposed drug formulary [hereinafter the "Moore-Mikael list"] containing approximately 4,000 drugs listed generically. Cost savings as a result of the new list were projected at approximately $6,000,000.00 annually to the State.

At the time the proposed list was submitted, the Dean of the School of Pharmacy in a letter to Sam Thurmond, Director of the Medicaid Program, suggested that in view of the shortness of the time in which the list had been compiled, the Department of Human Resources should conduct both an in-house review of the list, as well as submit the list to a panel of doctors and pharmacists for a thorough review of its practical effect before implementation thereof. With respect to the latter review, a committee comprised of four physicians and four pharmacists was formed and met on two occasions to consider the adequacy of the list [hereinafter the "Okel Committee"]. The first meeting was devoted primarily to a discussion of the theoretical advantages of a closed vis a vis an open formulary for the administration of the Medicaid drug component. By a vote of four to two the basic concept of a closed formulary was accepted with no physicians dissenting. At a second meeting scheduled approximately three weeks later in April to discuss the substantive adequacies and deficiencies in the list, the discussion again began with a reconsideration of the closed formulary, and a three-to-three tie vote was broken by the Chairman of the Committee, Dr. Okle, in favor of the concept of the closed formulary.

Thereafter, the members of the Okle Committee proceeded to review approximately ten of the thirty-five categories of generic drugs on the Moore-Mikael list as to medical efficacy, and committee members made suggestions as to other drugs which had been omitted which they felt should be included with respect to the 25–30% of the

**2.** The current categorical exceptions to the present formulary include certain appetite suppressants, most intravenous treatment except for insulin, and certain dietary supplements.

**3.** Among the state plan requirements set forth in 42 U.S.C. § 1396a(a) is the requirement in subsection (14) governing the imposition of co-payments or cost-sharing on Medicaid beneficiaries. The applicable statutes and regulations provide that cash assistance recipients and other individuals may not be required to contribute to the costs of mandatory services, 42 U.S.C. § 1396a(a)(14), 45 C.F.R. § 249.40(a)(1), and that any such charge with respect to other medical or "optional" care will be nominal in amount, as determined in accordance with standards approved by the Secretary and included in the plan. 42 U.S.C. § 1396a(a)(14)(A)(ii).

list which was discussed. Although another meeting was attempted to be scheduled, it never came to fruition. Thereafter, because of other critical legal conflicts between the physicians in Georgia and the Medicaid program, CMADL disappeared from view until Dr. Okle, who was also a member of the Board of Human Resources, realized that "Medicaid desired the closed formulary" in view of its potential "cost-saving" effect, and that a resolution to adopt CMADL would be offered at the next meeting of the Board of Human Resources. Realizing that CMADL was not likely to pass in its present stage, after study of the list, Dr. Okle added about two or three dozen additional drugs to the list as an "addenda" in order "to make it more palatable to practicing physicians." These drugs were added just prior to the August board meeting of the BHR. At the August board meeting, the BHR was confronted with two proposals: (1) that the board adopt CMADL with the proviso that the drugs in "addenda A" be included, and with the further proviso that an ongoing formulary committee meet to consider additions and deletions and (2) that the present formulary be continued, and, thereafter, proceed to delete those drugs that had been consistently abused, were costly, unsafe, or ineffective, such as the minor tranquilizers Valium and Librium. The former resolution was adopted on August 25, 1976, and the new formulary was scheduled to go into effect on November 1, 1976.

Thereafter, on or about October 19, 1976, defendants mailed copies of CMADL to those physicians and pharmacists who were providers of services under contract with Medicaid. Moreover, the approximately 700,000 recipients of Medicaid also received a brief notice explaining the essential features of CMADL which would go into effect on November 1, 1976, and further giving examples of ten of the most popular drugs which would no longer be reimbursable after October 31, including Valium, Indocin, Darvon Compound, Empirin with Codeine, and Librium. Recipients were further advised that they should confer with their pharmacists to determine whether drugs they were currently receiving were reimbursable and to consider whether they should ask their physicians to prescribe an alternative drug on the CMADL formulary or to seek prior approval in order to assure reimbursement for their currently prescribed medicine.

Plaintiffs commenced the instant action on October 8, 1976, challenging the proposed implementation to CMADL on two grounds:

(1) that CMADL is, itself, medically unsound in the sense that it will deprive thousands of Medicaid recipients of effective chemotherapy, in violation of the federal scheme which requires that optional services such as the drug component provided by a State plan be "sufficient in amount, duration, and scope to reasonably achieve their purposes." 45 C.F.R. § 249.10(a)(5)(i); and

(2) that the procedures for implementing CMADL are inherently defective by statutory, regulatory, and constitutional due process standards, the effect of which would be to deprive Medicaid recipients of access to drugs necessary for their effective medical treatment.

At a hearing before this court on October 28, 1976, convened to consider the propriety of entering a temporary restraining order enjoining defendants from implementing CMADL, this court voiced its concern over the insufficiency of notice to the recipients and the possibility that Medicaid recipients might be deprived of adequate medical treatment by the immediate implementation of CMADL. The defendants, therefore, postponed proposed implementation of CMADL until December 1, 1976, and the matter was set down for a hearing on the merits of the entry of a preliminary injunction.

## PRIOR APPROVAL

Prior to the preliminary injunction hearing, defendants sought to alter the prior approval mechanism that is currently in effect as a result of a study submitted by Dr. Mikael on November 24, 1976. *Pharma-*

*cy Services Special Approval Request Report for Georgia Medical Assistant Program* (Nov. 24, 1976). The stated purpose of the new special prior approval mechanism is to enable eligible Medicaid recipients to obtain non-CMADL drug products as service benefits when:

their diagnosed medical condition necessitates it, when their use is consistent with recognized medical standards of good practice, when their use is supported by valid controlled clinical studies, and when their use is consistent with a high quality of medical care.

*Id.* at p. 1.

The salient criteria to be utilized in special prior approval determinations is that the non-CMADL drug must be (A) drug-product specific and (B) that it be patient-specific. To be drug-product specific, a given drug must satisfy one or more of the following criteria:

1. Drug product is to be used in *lieu* of hospitalization to maintain patient on an outpatient basis.
2. Drug product is required and indicated for the treatment of *acute* and *life-endangering* conditions.
3. Drug product is required and indicated for the treatment of *acute exacerbation of chronic illness.*
4. Drug product is indicated in *neoplasms*, and the drug product has received a final classification as *effective* for the condition which it is being prescribed by the National Academy of Sciences/National Research Council Committee.

*Id.* (emphasis in the original).

To be *patient specific*, it is necessary to satisfy one of the categories above *and* further the patient must be categorized by a physician as a member of one of the following categories:

1. Patient is diagnosed as *allergic* to the CMADL drug products which are otherwise indicated for the patient's medical condition.
2. Patient is diagnosed as having a condition which *contraindicates* use of the CMADL drugs otherwise indicated.
3. Patient is under a mode of medical therapy, that has *no rational alternative*, that would be *complicated, interfered or negated by use of CMADL drugs* otherwise indicated for the patient's medical condition.
4. The patient's prior medical therapy for the specific diagnosis has included an *adequate medical trial of CMADL drug products indicated* for the condition.

*Id.* (emphasis in the original).

Special approval requests must be made by the duly authorized prescriber either in writing or by phone and in addition must include such information as the prognosis, diagnosis, and all other medication that is currently being prescribed the recipients. The proposed prior approval procedures contemplate that ultimate determinations as to whether prior approval should be granted would be the responsibility of a doctor of pharmacy, by reference to the compliance of the prescriber's information supplied in the application with (1) officially approved drug product labeling, such as the drug package insert, and (2) the NAS/NRC drug efficacy study Food & Drug Administration Index to evaluations. The doctor of pharmacy would be assisted by a staff of two registered pharmacists in handling requests and making such determinations. The Mikael report projected that the *maximum* time frame in making prior approval determinations was fifteen minutes when by telephone, or within *two working* days when submitted in writing, although there was testimony by Tom Smith, Director of Program Management for Medicaid, that forty-five minutes and three to four working days respectively was a more realistic calculation. In any event, it is undisputed that the prior approval center would be open and available for requests only from 8:30 A.M. to 4:30 P.M. on weekdays. Prior approvals, if granted, would be valid only for a period of 90 days, and if the approval request is denied, the physician may request in writing a formal

reconsideration of the Drug Utilization Review Committee.

### MERITS

As set forth previously above, the state Medicaid plan may provide for reimbursement of optional services such as the component for reimbursement of prescription drugs. See 42 U.S.C. § 1396d(a)(12). In this connection, federal regulations provide that even though not required, optional "items must be sufficient in amount, duration, and scope to reasonably achieve their purposes." 45 C.F.R. § 249.10(a)(5)(i). Moreover, applicable federal regulations define prescription drugs and their purposes as follows:

"Prescribed drugs" are any simple or compounded substance of mixture of substances prescribed as such or in other acceptable dosage forms for the cure, mitigation or prevention of disease, or for health maintenance, by a physician or other licensed practitioner of the healing arts within the scope of his professional practice . . .

45 C.F.R. § 249.10(b)(12)(i).

Reading the above regulatory provisions together, it is clear that provision by the state of a drug formulary reimbursable by Medicaid must be sufficient in amount, duration, and scope to reasonably achieve its purpose, that is, "the care, mitigation or prevention of disease" or the maintenance of the health of intended beneficiaries of the prescription drug program.

█ The meaning of the phrase "sufficient in amount, duration, and scope to reasonably achieve [their] purpose[s]" is not entirely clear from the statute. However, several cases in the Medicaid area are illustrative. At the outset, numerous decisions in this area have recognized the relative flexibility and discretion of the state to design Medicaid benefit programs tailored to meet the needs and demands of that particular state, including the level of benefits. E. g., *Briarcliff Haven, Inc. v. Dept. of Human Resources*, 403 F.Supp. 1355 (N.D.Ga.1975); *Dandridge v. Williams*, 397 U.S. 471, 478, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1969); *District of Columbia Podiatry Society v. District of Columbia*, 407 F.Supp. 1259 (D.D.C.1975); *White v. Beal*, 413 F.Supp. 1141 (E.D.Pa.1976); *Doe v. Beal*, 523 F.2d 611, 621 (3rd Cir. 1975) (en banc). Title XIX expressly authorizes the use of federal funds "for the *purpose of enabling each State, as far as practicable under the conditions in such State*," to furnish Medicaid, and, therefore, expressly recognizes financial matters as relevant considerations in fashioning Medicaid programs. 42 U.S.C. § 1396 (emphasis supplied). Moreover, particularly where the contested service is defined as an "optional" item, the State may impose limitations on the scope of this service. See 45 C.F.R. § 249.10(b)(6). *District of Columbia Podiatry Society v. D. C.*, supra, at 1265 [hereinafter "Podiatry Society"]. However, in providing such services the discretion of the state is not unbridled, since a state must provide the scope of service sufficient to achieve the purpose of the item in the scheme of the federal program. *White v. Beal, supra*, 413 F.Supp. at 1153. *Cf. Doe v. Beal, supra*, 523 F.2d at 621.[4]

---

4. The somewhat opposite results in these decisions can be explained by reference to the evidence before the court in each case. For example, in *White v. Beal, supra*, it was clear that not only the applicable regulation expressly provided that the purpose of eyeglasses was to aid or improve vision but there was further expert evidence that disease or pathology could not, in many instances, be arrested, treated, or improved with eyeglasses. *Id.* at 1153. On the other hand, in *Podiatry Society*, an action brought by providers of podiatric services rather than Medicaid recipients, the court noted parenthetically that it had found persuasive testimony by the Chief of the Medicaid Unit for the District of Columbia, that no complaints from eligible Medicaid recipients had been received that they had been unable to obtain needed podiatric care. Therefore, the court found that there was no controverting evidence to show that the covered podiatric services were not achieving their intended purposes. 407 F.Supp. at 1265, n. 7.

Several courts, in dicta, have suggested what might or might not constitute "unreasonable" limitations on a prescription drug component. For example, in *Podiatry Society*, the court stated:

Thus, to illustrate the parameters of the State's discretion, in *White v. Beal, supra,* the District Court for the Eastern District of Pennsylvania, held that Pennsylvania's provision of "eyeglasses" to "persons with eye pathology" and to school children with "ordinary refractive errors" was inconsistent with the federal regulation defining the purpose of "eyeglasses" as "lenses . . . *to aid or improve vision.*" 45 C.F.R. § 249.-10(b)(12)(v). (Emphasis supplied). On the other hand, in the *Podiatry Society* decision, the District Court for the District of Columbia, held that a fee schedule and a limitation on the scope of podiatry services which may be reimbursed were reasonable limitations on the scope of that optional service. *Id.,* 407 F.Supp. at 1265. Accordingly, the court concluded that the State Plan therein had placed no unreasonable limitations on the coverage of podiatric services which would prevent it from achieving its purpose, in the absence of any complaints from Medicaid recipients that they had been unable to secure needed podiatric care.

The question thus presented is whether CMADL provides prescription drugs to Medicaid beneficiaries in sufficient amount, duration, and scope to reasonably achieve the drug component's purpose of mitigating or preventing disease, and the maintenance of health for Medicaid beneficiaries. The medical efficacy *vel non* of CMADL cannot be decided without reference to the prior approval system which is inextricably tied to the provision of quality health care to Medicaid recipients, since we assume that any inadequacies in the list of reimbursable prescription drugs could presumably be cured by resort to speedy and effective prior approval procedures. At the outset, plaintiffs argue that CMADL itself is so wholly insufficient to make available to panoply of drugs necessary for the effective medical care of intended beneficiaries, that even a properly operated prior approval system would not obviate its substantive inadequacies.

At the evidentiary hearing held before this court there was considerable testimony by physicians in various specialized areas of practice that the CMADL list itself does not provide a full complement of drugs necessary to provide health care services. To illustrate, Dr. Wesley S. Wilborn, a dermatologist, testified as to certain inadequacies in the list, and concluded that he "could not practice quality medicine in dermatology with CMADL." In particular, he noted that compared to the prior list, there were only two cortico steroid preparations that remained on the list, those of the lowest potency which had been used primarily before 1960. He testified further that these drugs were less effective and, therefore, would not ordinarily be his first line of defense. Since certain steroids were not on the list and, therefore, might not be reimbursed until prior approval could be secured he would be forced to resort to short-term use of systemic-cortico-steroids. Systemic steroids are stronger than what he considered medically acceptable in the early stages of treatment, and further have potentially dangerous and undesirable side effects including cataracts and diabetes. Moreover, Dr. Wilborn testified that even short-term use of the higher potency drugs

This limitation-setting provision [45 C.F.R. § 240.10(a)(5)] enables the States to have some degree of control over not only the amount, duration, and scope of services, *but the cost of the Medicaid program to the State. As for the items being sufficient to achieve their purpose, this provision has been placed in the regulations to assure that [if] a service is covered in the State Plan no unreasonable limitations are placed upon the covered service which would prevent it from achieving its purpose. For example, it would be unreasonable for a State to cover immunization against polio but limit the dosage of vaccine to one.*

*Id.* at 1265. (Emphasis supplied).

In a similar vein, another court in dicta has suggested that some regulation of treatment is permissible and unavoidable, provided that they carry out the purposes of the Act, noting that

Pursuant to the congressional interest in economization, the state might require doctors to prescribe generic drugs rather than brand names, provided, of course, that this would . . . in the particular instance, be consistent with sound medical practice. *Doe v. Beal,* 523 F.2d at 621.

would require more frequent office visits to monitor the patients for the presence of signs of side effects. Also, when questioned as to the efficacy of a prior approval system to remedy such defects, Dr. Wilborn, whose practice consists of forty percent Medicaid patients, testified that ninety percent of these patients would need prior approval, and that it would be virtually impossible for him to carry on an active practice with the resort to either telephonic or written requests for prior approval.

In a similar vein, Dr. John McCoy, a specialist in internal medicine, with a sub-specialty in rheumatology, opined that with respect to the treatment of myocitis (muscle inflammation) the list contained only two of the six nonsteroid anti-inflammatory agents approved for use in the United States.[5] Of the two that remained on the list, he testified that he has found Motrin to be effective in only a limited number of his patients, and that it was more expensive than Indocin, which had not been included on the list. Likewise, he noted that Phenobutezone, which had the most dangerous side effects, was included on the list. Although aspirin was made available on the list restricted to use for arthritis, Dr. McCoy testified that aspirin, in the dosages often required to relieve the often omnipresent pain of his arthritic patients, frequently causes irritating stomach pain, and may in extreme cases cause stomach bleeding. In conclusion, Dr. McCoy testified that in view of individual patient variation in response to drugs, he felt that he needed a full "panoply" of drugs to effectively treat rheumatoid diseases.

Dr. Douglas Glover, an obstetrician and gynecologist, who also holds a degree as a doctor of pharmacy, testified as to his own reactions to CMADL and those which had been communicated to him as a result of inquiries he had made to other members of the Cobb County Medical Society. One most striking example was the problem of "lead poisoning" which is not an uncommon occurrence in metropolitan Atlanta, particularly with Medicaid patients. Of two drugs available to treat "lead poisoning" neither are contained on CMADL; as a consequence, whereas some emergency treatment of lead poisoning might be available at home, the patient would be required to be hospitalized since prior approval could not be obtained that quickly. Moreover, with respect to his own specialty, Dr. Glover testified that prenatal supplements had not been included on CMADL which contain certain vital elements, notably pholic acid, the absence of which might cause central nervous deficiencies in the new born child. Although conceding that "one-a-day" vitamins were included on the list as automatically reimbursable for pregnant Medicaid recipients, as well as pholic acid and iron, the components of most prenatal supplements, he noted that three prescriptions would be required instead of one, and that the co-pay cost to each recipient would be $1.50 instead of $.50, and Medicaid would be required to reimburse the provider pharmacist $2.00 over cost for each prescription. In sum, the total cost to Medicaid and the recipient for the component parts would be $10.00, rather than $7.91 for the prenatal supplement itself. Furthermore, in addition to the cost considerations, Dr. Glover stated that even assuming that such components were theoretically on the list, the trace elements were not realistically prescribable because they were not available in proper dosages. Thus, both human and cost factors influenced his conclusion that the list itself was not consistent with the purposes of the Medicaid program. A similar complaint as to the nonavailability of certain essential compounds was lodged with respect to Donnatol. Dr. Glover testified that he had found Donnatol to be an inexpensive drug that was effective in treating stomach and intestinal tract disorders, which is produced by combining twelve drops of tincture of belladona, a toxic and

---

**5.** One of the new drugs testified by Dr. McCoy to have been particularly effective and excluded from the CMADL list, Napacin, has been proposed to be withdrawn from the public market, according to an October 15, 1976, application by the Food and Drug Administration published in the Federal Register.

bad-tasting drug which if misused may cause heart disorders, with one drop of elixir phenobarbitol. Dr. Glover testified that by prescribing the component parts rather than the compound itself, it was not inconceivable that children might mix these toxic drugs in the wrong proportion, or at the very least, the unpleasant taste of tincture of belladona might exacerbate patient compliance to the detriment of the ultimate well-being of Medicaid recipients.

With respect to the prior approval system, the expert physicians testifying on behalf of the plaintiffs were unanimous in their conclusion that any acceptable prior approval system should not involve a doctor of pharmacy as the ultimate decision maker, noting that a doctor of pharmacy was neither qualified nor competent in making the ultimate determination as to whether the prescribing physician's request should be approved. In support of this conclusion, the testifying physicians agreed that the physician's familiarity with his individual patients, his familiarity with the pharmaceutical drugs that he prescribes, his patients' reactions thereto, and his experience in the practical aspects of the practice of medicine made the prior approval of the scope contemplated under a relatively closed drug formulary unworkable. Accordingly, most of the physicians who testified agreed that any workable prior approval system would require a group of specialists in each area to make any ultimate judgments as well as some sort of procedures designed for emergencies in order to avoid hospitalization of patients that might otherwise be treated on an outpatient basis.

To generalize, then, with respect to the CMADL formulary itself, physicians were of the general opinion that the list was inadequate on its face because of the absence in most specialized areas of practice of certain medium-potency drugs, the proliferation on the list of older but less effective drugs, and the emphasis on component parts rather than compounds. The unavailability of compounds was foreseen to increase costs to both the state and the individual recipient and interfered with patient compliance. Moreover, the doctors also concurred in their criticism of the capability of a doctor of pharmacy to effectively judge or "second-guess" the treating physician's judgment as to the necessity of a given prescription, and the dearth of emergency procedures to handle off-hours requests for immediate special approval. In view of the above deficiencies, Dr. Glover testified that in his own expert opinion, the nature of a prior approval system required to make the proposed formulary sufficient in amount, scope, and duration to prevent, cure and mitigate disease or maintain health might not be less costly than the current relatively open formulary, and that under CMADL the amounts paid by the state might merely be shifted from automatic reimbursement for prescription drugs which the attending physician had prescribed to payment for the administrative costs of an unwieldy prior approval system. Likewise, the consensus of the physicians who testified, including Dr. Okle, was that the CMADL formulary might have been more effectively devised had there been more physician input in the original construction of the list as well as input from a trained pharmacologist, i. e., one who deals in the study of drugs *per se* and their chemical effect on patients. Nevertheless, Dr. Okle did testify that despite his original negative reaction to the closed formulary he found that the research methods used by Drs. Moore and Mikael had been impressive and in depth, and he felt that the original list with the addended drugs was medically satisfactory.

## INJUNCTIVE RELIEF

 It is well settled that it is incumbent upon a plaintiff seeking preliminary injunctive relief to prove: (1) a substantial likelihood that he will prevail on the merits; (2) a substantial likelihood that plaintiff will suffer irreparable injury if the injunctive relief is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the injunction will not disserve the public interest. *Canal Authority of State of Florida v.*

*Callaway,* 489 F.2d 567, 572 (5th Cir. 1974); *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975). Moreover, it is equally well recognized that "[t]he burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Id.* at 573; *Sadler v. 218 Housing Corp.,* 417 F.Supp. 348 (N.D.Ga.1976).

■ At the outset, this court finds that plaintiffs have made a persuasive showing that the proposed CMADL and the prior approval mechanism which forms an integral part thereof in its present form are unlikely to deliver to Medicaid recipients in Georgia the scope and quality of services necessary to achieve the prescription drug component's purpose of curing, mitigating, or preventing disease, or for maintenance of health as required by 45 C.F.R. § 249.-10(b)(12)(i). Even as Dr. Mikael conceded, the proposed formulary is designed to be effective in the treatment of only 90–95% of the medical problems which a physician might encounter. However, contrary to plaintiffs' contention, we are unable to take the polar position that CMADL itself is *per se* medically unsound, even assuming certain inadequacies in and omissions from the formulary of drugs itself, which were capably highlighted by the expert physicians who testified at the hearing.

On the contrary, it is this court's studied opinion that the fatal flaws in the proposed program lie not so much in the drugs delisted, but rather in the absence of what this court considers to be a medically sound and effective prior approval system, which would make non-CMADL pharmaceuticals available to those who truly need them, in a speedy and efficient manner with the least interference with the relationship of physicians and Medicaid patients and the informed judgment of the patient's physician. Critical to our finding that CMADL *taken together* with the prior approval system is medically unsound is that the existing approval mechanisms do not contain emergency procedures which would allow physicians to either obtain prior approval on weeknights, weekends, and holidays, or alternatively, to allow the attending physician to himself certify the medical need and the emergency situation to assure that his patient will receive perhaps a five-day dosage until prior approval could be obtained. In the absence of such emergency type procedures, there has been competent testimony to the effect that hospitalization might be the only alternative, which is certainly more costly to the Medicaid system as a whole and disruptive of the individual lives of Medicaid beneficiaries. Likewise, this court finds it unrealistic for defendants to presume that a doctor of pharmacy is capable of making that type of informed judgment which is necessary to ultimately review any request for prior approval for a drug which the requesting physician in his experience has found to be medically necessary and indicated for a patient with whom he is intimately familiar. The ultimate discretion which need be exercised in the prior approval situation would, of course, involve some consideration of information contained in drug inserts and approved drug lists, but the decision must further reflect the practical experience only possessed by one who is skilled in the medical field and perhaps even in certain specialties.

■ With respect to the second prerequisite for injunctive relief that plaintiffs demonstrate that they will suffer irreparable injury if the injunction is not granted—this court must conclude that plaintiffs have credibly demonstrated that in the absence of a workable prior approval system, plaintiff Medicaid recipients might be cut off from indicated prescription drugs overnight, over a weekend, or indefinitely pending a review by the Utilization Review Board. While it is true that since Medicaid is only a reimbursement program, rather than some prior restraint on the availability of prescription drugs, we would be blinking reality to conclude that Medicaid recipients in the State of Georgia, who are by definition the "categorically needy", would have the financial capability to have diverse prescriptions filled in the interim.

■ The third precondition to injunctive relief—that the threatened harm to the plaintiff outweighs the threatened harm to

the defendant—requires a sensitive balancing of the competing policy interests at stake herein. On the one hand, the defendants have effectively documented the history of abuse and/or overuse of certain drugs available for reimbursement without restriction under the Medicaid program, which may be of dubious efficacy in the treatment of certain disorders, including certain notoriously popular pain killers and mild tranquilizers, such as Darvon, Valium, Indocin, and Librium.[6] Similarly, assuming arguendo, that the present list contains drugs equally effective and safe, and that there are adequate alternatives for the drugs excluded from CMADL, the substantial projected savings of $6,000,000.00 annually is both a relevant consideration of the State's and indeed, one of the express criteria of any appropriate Medicaid plan. *See* 42 U.S.C. § 1396. Thus, any substantial increase in costs to the State during the pendency of the injunction certainly falls within the category of threatened harm. On the other hand, however, the threatened harm to plaintiffs of even the temporary deprivation of needed pharmaceuticals, particularly in view of the *disputed* testimony as to the accuracy of any projected cost savings under CMADL, patently outweighs the potential harm to the state to continue reimbursement of the drugs on its current formulary pending final review of the two-pronged CMADL program on its merits.

Finally, we turn next to the factor of the public interest, and again are compelled to conclude that the public will be better served by the entry of an injunction with the clear conscience that Medicaid recipients will continue to have available certain drugs deemed medically necessary by their physicians pending a final determination of the merits of the instant action.

Finally, although this court has found that plaintiffs have amply satisfied the four prerequisites for preliminary injunctive relief, even assuming arguendo, that the relative hardships of the parties appear in balance, the critical issue becomes the likelihood of success on the merits, for it would be inequitable to grant a preliminary injunction if the plaintiff has no ultimate chance of success on the merits. *Canal Authority of Florida v. Callaway, supra,* 489 F.2d at 576; *Hawthorn Environmental Preservation Association, et al. v. Coleman,* 417 F.Supp. 1091, 1098 (N.D.Ga.1976); *Sadler v. 218 Housing Corp., supra,* 417 F.Supp. at 360. Plaintiffs, however, have made a particularly persuasive showing that they have an ultimate chance of success on the merits as to the medical unsoundness *vel non* of CMADL and the current prior approval procedures, with the result that it would not be inequitable to enter temporary injunctive relief.

In sum, plaintiffs have ably demonstrated the presence of the traditional prerequisites to injunctive relief, and, accordingly, plaintiffs' motion for a preliminary injunction restraining defendants from implementation of CMADL and the proposed prior approval procedures is hereby GRANTED.

### DUE PROCESS

Plaintiffs have alternatively sought to enjoin implementation of CMADL on statutory, regulatory, and constitutional due process principles. In particular, they rely upon 45 C.F.R. § 205.10(a)(4)(i)(B)[7] which requires state plans in "cases of intended action to discontinue, terminate, or reduce assistance" to give timely and adequate written notice of the intended action, the reasons therefor, and the right to re-

---

6. In this respect, we note that 120 of the 200 most popularly prescribed drugs have been excluded from CMADL as proposed.

7. 45 C.F.R. § 205.10(a)(4) provides that "in cases of intended action to discontinue, terminate, suspend, or reduce assistance" a State Plan must:

 (i) . . . give timely and adequate notice
. . .

(B) [and] Adequate means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, specific regulations supporting such action, explanation of the *individual's* right to request an evidentiary hearing . . . (emphasis supplied)

quest an evidentiary hearing if appropriate. It appears to this court that the language of the regulation relied upon applies more closely in the event of any intended action with respect to a qualified "individual", rather than an across-the-board change in the drugs that will be reimbursed for all beneficiaries of the program.

■ The more precise focus of the court's inquiry into plaintiffs' procedural due process claims is whether plaintiffs' expectation that the drugs they are currently receiving will continue to be reimbursed rises to the level of a "legitimate claim to entitlement", or in other words, whether they have a "property interest" within the meaning of the due process clause. *See, e. g., Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In the analogous context of public housing benefits, this court has implicitly held that while plaintiff recipients have a legitimate claim to entitlement to continue to be placed in public housing in general, they have no concomitant "property interest" to continue to live in any particular housing project. *Sadler v. 218 Housing Corp., supra, Jones v. United States Department of Housing and Urban Development*, 68 F.R.D. 60 (E.D.La.1975). By analogy, then, plaintiffs' legitimate claim to entitlement under the Medicaid provision extends only to their right to receive continued reimbursement "in an amount, duration, and scope reason-

ably necessary to achieve" the purposes of the drug component, that is, to receive drugs which cure, prevent or treat their illnesses or those that maintain them in proper health; however, they do not *ipso facto* have a "property interest" in continued receipt of reimbursement for the identical drugs which are currently prescribed for them, if there are included in the CMADL list certain equally effective drugs or if prior approval can be obtained to ensure an adequate level of chemotherapy. Since in the earlier portion of this order we have concluded that plaintiffs have shown an ultimate chance of success on the merits, that is, that CMADL and the Special Approval Mechanisms are statutorily inadequate, plaintiffs are presumptively entitled to notice of the proposed changes at a meaningful stage in the implementation process. Moreover, we agree with plaintiffs that notices sent by the defendants to the individual beneficiaries on November 1, 1976, designated "Important Notice to Medicaid Recipients" contain certain confusing information to the extent that such notice while advising recipients to check whether prior approval will be necessary, further indicated that the recipients may request such approval themselves.[8] Nevertheless, plaintiffs request that individualized notice be sent to all current Medicaid recipients in the state, all providers of services, and all non-provider physicians explaining any changes in drug reimbursement and the status of the instant proceedings.

**8.** The original notice to recipients with regard to implementation of CMADL was sent on October 19, 1976. Thereafter, on November 1, 1976, notice was sent to the recipients explaining that implementation would be delayed until December 1, 1976, and further advising recipients: *"While you may ask for prior special approval, it would be better for your doctor to do so because he will probably know much more about the drugs."* (Emphasis in the original). Plaintiffs contend that this statement together with substantive changes in the criteria for prior approval, including the requirement that physicians list all other medication currently being prescribed for the patient, constitutes a severe departure from the previous prior approval mechanisms that were in effect. Moreover, they contend that implementation of CMADL would be further inequitable at this

time since defendants have never retracted a statement contained in a "Notice to Providers" that any drugs delisted from CMADL would be non-prior approvable. Review of these relevant documents convinces this court that there may be some inconsistencies in statements made by the defendants to interested parties, although it is now apparent that even under the previous prior approval mechanisms, requests could only be made by the prescribing physicians. *See* Section 305, *Pharmacists' Manual*; Section 301, *Physicians' Manual*. In any event, since we have enjoined the implementation of CMADL on the substantive grounds presented by plaintiffs, we need not, at this time, delineate the scope of any notice that might cure the apparent deficiencies and inconsistencies in previous notices.

The touchstone of adequate notice under the fundamental principles of due process is that "within the limits of practicability notice must be such as is reasonably calculated to reach interested parties." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1962). Applying that principle in the instant case, we are unable to conclude that notice of the scope requested by plaintiffs is constitutionally mandated, since the effect of our injunction is merely to preserve the status quo and enjoin implementation of CMADL rather than deprive recipients of any vested property rights. Moreover, with respect to practicability we are sincerely persuaded by the testimony of Mr. Tom Smith, that the November 1, 1976, individualized notice sent to individual recipients required the employment of three additional people by the Department of Human Resources, the man-hours of eight employees working from one-half day to a day, for over a week, at a cost to the state of over $50,000.00. Thus, we conclude that while individualized notice *might* at some time be required of the scope requested by plaintiff, we find that it is not required at the present time. This determination is in some part predicated upon the burden to the state of individualized notice and the defendants' assurance that public notice will be provided through the public broadcast and newspaper media, and that notice will be sent to the local offices of the Child and Family Welfare Services throughout the state to inform potentially affected recipients of the status of these proceedings and the injunction against implementation of CMADL. Accordingly, we conclude that implementation of CMADL and the Special Prior Approval procedures on the basis of the notices already sent would be inconsistent with plaintiffs' rights to procedural due process since implementation of CMADL would deprive plaintiffs of their "property interest" and legitimate claim to entitlement to receive benefits from the prescription drug component in scope, amount, and duration necessary for quality health care. However, because of *Mullane* we decline to order the defendants to provide comprehensive individualized notice to all recipients, providers, and non-providers at the present time.

Accordingly, defendants are hereby ENJOINED pending further order of this court from the implementation of the Controlled Medical Assistance Drug List in conjunction with the proposed Special Prior Approval procedures adopted pursuant thereto. The defendants are hereby ORDERED to advise this court not later than thirty (30) days from the date of this order whether they intend to proceed further in the instant action and whether it will be necessary to set these matters down for a hearing as soon as practicable on the propriety of entering a permanent injunction, and/or whether they will seek some interlocutory appeal from the instant order. *See* 28 U.S.C. § 1292. Moreover, should defendants seek to amend or substantively change CMADL and/or the Special Prior Approval procedures, they are hereby ORDERED to advise this court immediately, but not later than forty-five (45) days from the date of this order.[9]

IT IS SO ORDERED.

---

**9.** In this connection, should the defendants seek to modify the contours of the list and/or the prior approval mechanisms from those considered by this court at the hearing on the preliminary injunction, this court shall appoint a panel of experts, including physicians, pharmacists, pharmacologists, and perhaps others, to serve in an advisory capacity to this court in connection with any further proceedings respecting the "medical unsoundness" of the CMADL program as a whole. In the event of that contingency, this court will establish more precise guidelines with respect to the appointment and composition of such an advisory committee.