Dexter H. SIMPSON, on behalf of himself and all others similarly situated,

and

Edith Emerson, Plaintiff-Intervenor

v.

David WILSON, Commissioner of the Vermont Department of Social Welfare.

Civ. A. No. 77–261.

United States District Court, D. Vermont.

Oct. 26, 1979.

---

James M. Libby, Vermont Legal Aid, Inc., Montpelier, Vt., for plaintiffs.

Michael O. McShane, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., for defendant.

## OPINION AND ORDER

COFFRIN, District Judge.

*Introduction*

Plaintiffs in this action challenge provisions of the Vermont Welfare Assistance Manual (WAM) that prohibit payment of Medicaid funds for glasses and physician services needed to correct plaintiffs' visual refractive error. Subsequent to our order certifying this suit as a class action, the parties submitted a Stipulation of Facts and affidavits. The court now has before it the parties' cross motions for summary judgment; we rule in favor of the plaintiffs.

*Facts*

This case arises out of Vermont's participation, through its Department of Social Welfare (The Department), in the federal medical assistance program (Medicaid), 42

U.S.C. §§ 1396–1396i, which is intended to assist states in providing medical assistance to the needy. The two[1] named plaintiffs represent a class composed of:

> all persons eligible for medical assistance in Vermont who are or will be in need of eyeglasses and physician's services related to their eyes, but have been denied or will be denied assistance because of the restrictive rules and practices of the defendant, which authorize eyeglasses and physician's services only for diseases of the eye or post-surgical eyeglasses.

Complaint at ¶ 6 (filed November 29, 1977).

The parties' stipulation states that the two named plaintiffs, Dexter Simpson and Edith Emerson, are low-income residents of Vermont who are or were eligible for Medicaid benefits. Plaintiffs had their eyes examined—Emerson by a licensed optometrist and Simpson by an ophthalmologist—and were advised that they needed stronger glasses to correct the refractive error in their eyes. Both ordered the lenses and frames but were not permitted to pick up the glasses until they had paid for them in full. When plaintiffs applied to the Department for Medicaid funds to pay for the examinations and the glasses, the Department refused their requests on the basis of WAM section 2461.2.[2] This provision generally prohibits the Department from paying for physician services for the eyes or for glasses unless the claimant's vision problems arise from an eye disease or from surgery to treat an eye disease.

The affidavits of two ophthalmologists and one optometrist[3] reveal that refractive

---

1. On June 23, 1978, we granted plaintiff Edith Emerson's motion to intervene.

2. On June 1, 1979, WAM § 2461.2, the section which this suit sought to enjoin, was replaced by WAM § 2467 entitled "Vision Services." The new section was designed to make clear that the only sort of eye glasses the Vermont Department of Social Welfare will furnish are those that replace the function of a missing eye lens. Plaintiff concedes that the new section does not affect the basic issues in the case. Section 2467 specifies the only circumstances in which the Department will pay for eye care. It provides:

   *Vision Services*
   A. No payment will be made on behalf of recipients aged 21 and over for any expenses incurred for the following items or services:
   (i) eye examinations for the purpose of prescribing, fitting, or changing eyeglasses or contact lenses for refractive error and procedures performed in the course of any eye examination to determine the refractive state of the eyes whether performed by an ophthalmologist (or other physician) or by an optometrist.
   (ii) eyeglasses or contact lenses;—except that payment may be made for post surgical lenses customarily used during 'convalescence from eye surgery in which the lens of the eye was removed, or prosthetic lenses for recipients who do not have the organic lens of the eye; e. g., due to cataract surgery or congenital absence (in this context the post surgical lenses are deemed to be prosthetic devices replacing an internal body organ as provided in Section 2485).
   B. Payment will be made to a licensed ophthalmologist, optometrist or optician approved for participation in Medicaid for items and services rendered to a recipient under age 21 for the following items and services:
   (i) an annual eye examination (i. e., once every twelve months) for determination of visual efficiency and measurement of the powers or defects of vision. Prior authorization is required from the Division of Medical Services for any eye examination performed prior to the lapse of twelve months since the most recent examination paid by Medicaid.
   (ii) frames and/or lenses supplied annually (every 12 months) due to prescription change, irreparable damage, deterioration or loss. Prior authorization is required from the Division of Medical Services for lenses and frames to be supplied before the lapse of one year from the date they were most recently supplied.
   (iii) repairs made to eyeglasses such as new frame front, temples, hinges, pads or replacement of broken lenses.
   (iv) contact lenses, but only if prior authorization has been granted by the Division of Medical Services. Authorization may be granted only when contact lenses will provide significantly better management of an ocular condition such as aphakia, keratoconus, corneal transplant, or irregular corneas.

   The papers of neither party raise any question concerning subsection B (formerly § 2461.2(b)), nor have plaintiffs explicitly excluded persons under 21 from the class. It is apparent from the parties' arguments and implicit in the definition of the class, however, that plaintiffs do not challenge this part of the regulation. Thus the court will consider subsection 2467(A) only.

3. Affidavit of Ted V. J. Houle, M.D. (dated June 13, 1978); Affidavit of Armando J. Coello, M.D. (dated Oct. 3, 1978); Affidavit of Richard L. Leven (dated May 22, 1978).

error is not a disease of the eye, but rather a physical state of the structural components of the eye that in some cases can cause greater visual impairment than a disease. Refractive error does not generally lead to blindness, but can be so substantial that it renders an individual legally blind. The two principal diseases of the eye are glaucoma, which is generally treated with drugs, and cataracts, which can only be treated surgically. Both can cause blindness if not treated. Following cataract surgery, fitting the patient with glasses is essential to rehabilitation of the patient's vision. Glasses will correct almost all refractive error but, with the exception of cataracts, they are not generally used or effective in treating eye pathology. An ophthalmologist routinely checks a patient for both eye pathology and refractive error.

A fourth affidavit filed by defendant shows that according to the Department's records, "all of the persons, age 21 and older, who received eyeglasses received glasses as a result of cataract surgery." Affidavit of Kevin Rooney (filed October 26, 1978).

*Discussion*

1. Jurisdiction.

■ Plaintiffs' complaint raises three causes of action: 1. that WAM section 2461.2(a)⁴ is invalid because it is contrary to the federal statutes and regulations governing Medicaid; 2. that the state regulation violates plaintiffs' rights to equal protection because it irrationally discriminates between persons with eye diseases and persons with refractive error; and 3. that the regulation creates an irrebuttable presumption that only persons suffering from eye disease need eye examinations and glasses which presumption contravenes the plaintiffs' due process rights. Although we have no independent jurisdiction over plaintiffs' first claim, *see Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), the constitutional claims plaintiffs raise in their second and third counts are sufficiently

substantial to give us pendent jurisdiction over the first. *See Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *White v. Beal,* 555 F.2d 1146, 1148–49 (3d Cir. 1977).

2. Plaintiffs' Claim under the Statute and Regulations.

Medicaid is a program of "cooperative federalism" designed to assist states in providing medical care to the needy. The Medicaid statute requires a participating state to provide five specified services (mandatory services) to the categorically needy, who are generally defined as persons eligible for benefits under the categorical assistance programs of the Social Security Act. A participating state has the option of providing additional services from a list of sixteen (optional services) to less needy persons who are referred to as the medically needy. A state must make available to the categorically needy any optional services it provides to the medically needy. *See White v. Beal,* 555 F.2d 1146, 1149 (3d Cir. 1977). A state may pay "part or all of the cost of . . . care and services," 42 U.S.C. § 1396d(a), but it "may not deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c)(1) (1978). Although a state "may place appropriate limits on a service based on medical necessity or on utilization control procedures," *id.* § 440.230(c)(2), "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." *Id.* § 440.-230(a). Vermont has elected to provide the mandatory services as well as certain optional services to both the categorically and medically needy. WAM §§ 2450–2499.

Plaintiffs contend that Vermont has impermissibly limited its provision of eyeglasses and physicians' services for eye care to eligible individuals suffering from eye diseases. They argue that the State's denial of these benefits to persons whose vision impairment is caused by refractive error rather than disease violates the Medicaid statute and regulations. We agree.

4. See note 2 *supra.*

Physicians' services are among the five mandatory services. 42 U.S.C. §§ 1396a(a)(13)(B), 1396d(a)(5). The federal regulations that define the term provide that "physicians' services":

means services provided—

(a) Within the scope of practice of medicine or osteopathy as defined by State law; and

(b) By or under the personal supervision of an individual licensed under State law to practice medicine or osteopathy.

42 C.F.R. § 440.50 (1978). Moreover:

The plan must provide for payment of optometric services as physician services, whether furnished by an optometrist or a physician, if—

(a) The plan does not provide for payment for services provided by an optometrist, except for eligibility determinations under §§ 435.531 and 436.531 of this subchapter, but did provide for those services at an earlier period; and

(b) The plan specifically provides that physicians' services include services an optometrist is legally authorized to perform.

42 C.F.R. § 441.30 (1978). Thus the regulations clearly permit states to pay for eye care by doctors and optometrists.

■ Vermont has undertaken to provide this care, but only to persons suffering from a disease of the eye. WAM § 2467.A(ii) (quoted at n. 2 *supra*). The State denies this benefit to persons suffering from refractive error even if the resulting impairment is more substantial than that of others who receive the benefit because of disease. We hold that this is a reduction in the "scope of a required service . . . solely because of the diagnosis, type of illness, or condition" contrary to the federal regulations. 42 C.F.R. § 440.230(c)(1) (1978). *See Preterm, Inc. v. Dukakis,* 591 F.2d 121, 126–27 (1st Cir. 1979). Moreover, this limitation violates the requirement that "[e]ach service . . . be sufficient in amount, duration, and scope to reasonably achieve its purpose." *Id.* § 440.230(a). Ophthalmologists do not restrict their examinations of patients to searches for dis-

ease; they look for refractive error as well. Refractive error may not render an individual totally blind; however, eye care and the improvement of vision are hardly promoted by refusing to pay for examinations of an eligible person who may be legally blind. Since refractive error can in some cases cause greater visual impairment than diseases of the eye, we can only conclude that examinations of persons with refractive error are no less medically necessary than examinations of persons affected by disease. The federal regulations do not permit Vermont to decline to provide medically necessary services. *See Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Rush v. Parham,* 440 F.Supp. 383, 389 (N.D.Ga.1977).

We recognize that Congress intended to allow states substantial flexibility in devising their medical plans. *District of Columbia Podiatry Society v. District of Columbia,* 407 F.Supp. 1259, 1263–64 (D.D.C.1975). But we have been shown no "medical necessity" or "utilization control procedures" which might justify the State's distinction between refractive error and disease of the eye. Defendant's claim that financial constraints require him to impose some limits on services is unavailing here. The statute specifically permits the state to pay only part of the cost of a service if it chooses. 42 U.S.C. § 1396d(a). *See White v. Beal,* 555 F.2d 1146, 1150–51 (3d Cir. 1977). Moreover, "[t]he regulations permit discrimination in benefits based upon the degree of medical necessity but not upon the medical disorder from which the person suffers." *White,* 555 F.2d at 1152.

Similarly, we find no merit in defendant's argument that 42 C.F.R. § 441.30 read in concert with the state statute defining the services an optometrist may render shows that states may decline to treat refractive error. At the outset, we note that defendant has quoted to us only part of the definition of the services an optometrist may perform. The statute in its entirety defines the practice of optometry as:

(1) The examination of human eyes without the use of drugs to ascertain the

presence of defects of vision or of the ocular muscles;

(2) The employment of objective or subjective methods (either one or both) for the purpose of measuring the accommodative or refractive states of human eyes, the range or acuity of vision, or the state or power of the ocular muscles;

(3) The prescribing of lenses, prisms or ocular exercises to correct defects or abnormal conditions of the human eye or its extrinsic muscles or the adjustment, fitting, or adapting of lenses, prisms, eyeglasses or spectacles to relieve defects of vision.

Vt.Stat.Ann. tit. 26, § 1601. We do not think this statute, particularly subsection 3, restricts an optometrist to prescribing glasses for people suffering from refractive error only. Indeed, we think it would be entirely permissible for an optometrist to determine the prescription for a person recovering from cataract surgery. Moreover, defendant has mistaken the purpose of the federal regulation. It was not intended to give states the choice between providing optometrist services or not, but rather to specify when states must pay an optometrist for performing physicians' services.

Plaintiffs' second claim is that, in addition to impermissibly denying physicians' services, defendant's refusal to pay for eyeglasses needed to correct refractive error violates the Medicaid statutes and regulations. Eyeglasses are an optional service, 42 U.S.C. § 1396d(a)(12), which Vermont has elected to provide to persons recovering from eye surgery. Thus, only patients who have had cataract surgery receive eyeglasses under this state's Medicaid scheme. According to the medical testimony in the record, "after cataract surgery it is mandatory to provide an optical aid . . . if the person is to be visually rehabilitated." Affidavit of Dr. Armando J. Coello at ¶ 14 (filed October 20, 1978).

■ Although paying for eyeglasses is an optional service, the state's provision of it

must, like mandatory services, "be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). See White v. Beal, 555 F.2d 1146, 1151 (3d Cir. 1977); Dodson v. Parham, 427 F.Supp. 97, 104–05 (N.D.Ga.1977). The prohibition against denying or reducing "the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition," id. § 440.230(c)(1), also applies to optional services. White, 555 F.2d at 1151–52.

■ We must look to the definition of eyeglasses to determine the purpose of providing them through the Medicaid program. Dodson, 427 F.Supp. at 104. The definition found in the current regulation provides: " 'Eyeglasses' means lenses, including frames, and other aids to vision prescribed by a physician skilled in diseases of the eye or an optometrist." 42 C.F.R. § 440.120(d) (1978). The prior regulation had one additional phrase at the end: "to aid or improve vision," 42 C.F.R. § 449.10(b)(12)(iv) (1977), which would have made the court's determination of purpose quite simple. Nevertheless, despite the deletion of this phrase, we are convinced that there can be no other reason to supply people with glasses.[5]

The Third Circuit has already faced the question presented here, although in a slightly different factual context. In White v. Beal, 555 F.2d 1146 (3d Cir. 1977), the court considered Pennsylvania's Medicaid regulations governing the provision of eyeglasses. Like Vermont's provision of physicians' services for eye care, Pennsylvania provided eyeglasses to persons suffering from eye disease, but not to persons whose vision was impaired by refractive error. The court held:

The state plan's classification is arbitrary since it is based upon a factor not reasonably related to the medical need. We conclude that when a state decides to distribute a service as part of its participation in Title XIX, its discretion to decide how the service shall be distributed,

---

5. The deletion of the final phrase was not intended to reflect any change in the program; the change was made in the process of recodifying the regulations. The results of that proc-

ess first appeared at 43 Fed.Reg. 45224 (1978) and were preceded with the introductory statement that: "No policy changes have been made in the existing regulations." Id. at 45176.

while broad, is not unfettered: the service must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it.

*Id.* at 1151 (footnote omitted).

Defendant argues that *White* is distinguishable, because he provides glasses only to persons *recovering from cataract surgery* rather than to anyone suffering from an eye disease. This distinction is important, because the record shows that the eyes of someone who has had cataract surgery will not focus without glasses. Thus Vermont does not provide glasses to anyone who suffers only minor impairment from an eye disease while denying them to persons handicapped by substantial impairment because of refractive error. But the record also reveals that refractive error can be so great that it renders someone legally blind. Moreover, the parties have stipulated that plaintiff Edith Emerson "is now totally dependent on her glasses for all activities of daily life." Stipulation of Facts at ¶ 13 (filed October 20, 1978). Thus defendant denies glasses to persons whose vision may be just as impaired as that of persons who receive glasses because they have had cataract surgery. Finally, glasses are just as effective in improving the vision of persons afflicted by refractive error as they are in rehabilitating cataract surgery patients.

We can only conclude that although the conduct challenged here is somewhat less compelling than that in *White,* the Third Circuit's holding is not inapplicable. Vermont's limitation is not based on the individual's medical need but rather on his "diagnosis, type of illness, or condition."

We have already disposed of defendant's argument that fiscal considerations permit this restriction on the provision of eyeglasses in our discussion of the same claim concerning physicians' services. We are also unconvinced by defendant's contention that he does not provide eyeglasses to anyone, because in giving lenses to cataract surgery patients he is providing a prosthetic device. Both the statute, 42 U.S.C. § 1396d(a)(12), and the regulation, 42 C.F.R. § 440.120(c) and (d), list eyeglasses as a service that is distinct from prosthetic devices. This distinction would be meaningless if we accepted defendant's argument.[6] *United States v. Dinerstein,* 362 F.2d 852, 855–56 (2d Cir. 1966) ("We should prefer a construction which leaves to each element of the statute a function in some way different from the others.").

For the foregoing reasons, we grant plaintiffs' motion for summary judgment; we deny defendant's motion.

---

**6.** As noted in footnote 2, *supra,* WAM § 2467 replaced WAM § 2461.2 on June 1, 1979. The regulation as amended states that "post surgical lenses are deemed to be prosthetic devices replacing an internal body organ" whereas the regulation it replaced referred to "[p]ost-surgical eyeglasses, customarily used during convalescence from eye surgery." Thus defendant's earlier claim that the eyeglasses he provides following cataract surgery are considered by him to be prosthetic devices is now so stated by the regulation. This does not, however, alter our view that the definition of eyeglasses and prosthetic devices set forth in the statute, 42 U.S.C. § 1396d(a)(12) and the regulation, 42 C.F.R. § 440.120(c) and (d), are intended to provide a meaningful distinction between the two services, and calling what are actually "eyeglasses" "prosthetic devices" does not resolve the underlying difficulty with defendant's position.